WILLIAM H. TOWNSEND, APPELLANT, *v.* WINSLOW M. BELL AND ANOTHER, RESPONDENTS.

*Water-courses — pollution thereof — rights of a riparian owner in a stream — injunction — damages need not be shown — great injury to the defendant is not material — motive of plaintiff in purchasing.*

The firm of Henry Bell & Sons, in 1886, began to operate a plush factory upon a stream which ran by premises, lower down on the stream, consisting of about twenty square rods, which, in 1887, were purchased by one Townsend. The stream derived its water from two brooks, the waters of one of which were impure and were led by the firm around a dam upon their premises which had

been built before their occupation, while the waters of the clearer brook were received in the dam. The firm used colors in the process of manufacture which, passing into the stream daily, and seriously discolored and contaminated it at and along Townsend's premises. His premises were rough land and were not occupied. He had paid for them at public sale $2,210, but upon the trial the court found their value to be $100. It also found that he was not damaged by the contamination of the stream. There was evidence tending to show that the price of $2,210 was obtained because Townsend thought he would like to get the premises in order to rent them to the firm. The court found that the firm's use of the water of the stream was reasonable and necessary and dismissed the complaint.

*Held*, error.

That, upon the question of pollution, it was no defense to the firm that one of the brooks which formed the stream was impure and contributed to the result.

That while the riparian owner above was entitled to a reasonable use of the water for domestic, agricultural and manufacturing purposes, the owner below was entitled to receive the water in its natural purity, although it might be somewhat diminished in quantity.

That the law interferes by injunction in such cases to prevent frequent actions for damages.

That one need not show damages in order to entitle him to an injunction in such a case.

That great injury to the defendant is not a ground for refusing such an injunction.

That it was immaterial that when Townsend bought his lot the mill of the firm was in operation, and that it made no difference whether the injured party came to the nuisance or the nuisance came to him.

That the motive of Townsend in purchasing, *e. g.*, to annoy the firm, was not important and the court could not consider it.

(MAYHAM, J., dissenting.)

APPEAL by the plaintiff William H. Townsend from a judgment entered in the office of the clerk of the county of Ulster on the 7th day of May, 1891, dismissing the complaint, with costs, after a trial by the court, without a jury at the Ulster Circuit.

The court found as facts:

*First*. That the defendants own and operate a plush factory, situate on a certain stream near Milton, in the town of Marlborough, Ulster county.

*Second*. That the plaintiff is the owner of about twenty rods of barren, unproductive, uncultivated and unoccupied land, situate on said stream, below the defendant's factory; that he purchased said land after the defendant's factory had been in full operation for a considerable time, using the stream for the same purpose and to the same extent as at the commencement of this action; that he

paid $2,210 therefor, and that the actual value thereof does not exceed $100.

*Third.* That in operating said factory the defendants occasionally discharge into said stream colored water from their rinsing vats, whereby the water becomes colored, and in that condition flows, at such times, through the said land of said plaintiff.

*Fourth.* That such discharge is necessary to the convenient and successful operation of said factory, and that the defendants are greatly benefited by such use of said stream.

*Fifth.* That the said stream is not put to any use by the plaintiff; that the value of his land is not materially affected, and the plaintiff has not been, is not now, and is not likely to be in any way injuriously affected by such use of said stream by the defendants.

*Sixth.* That said use of said stream by the defendants is, under the circumstances of this case, reasonable and in no way harms plaintiff.

It also found that the plaintiff was owner of a stream at Milton, Ulster county, below lands owned and occupied by defendants as a factory for manufacture of plush goods.

There was also evidence given upon the trial to the effect that the plaintiffs, Henry Bell & Sons, bought these premises in 1886; that the defendant purchased his in 1887; that there was a dam upon the premises which had been built before the firm commenced to occupy; and that the object of Townsend in bidding for his lot $2,210 was to get possession of the premises in order to rent it to the Bell's, who bid against him at the sale thereof.

*George E. Reynolds* and *J. Newton Fiero,* for the appellant.

*John J. Linson,* for the respondents.

LEARNED, P. J.:

The plaintiff is the owner of a lot at Milton, on a stream emptying into the Hudson river. The defendants own and occupy land upon the stream just above the plaintiff, having a mill for the manufacture of plush. In that manufacture different colors are used; and from time to time water is discharged into the stream colored by the dyes used in the manufacture. The tubs in which the colors are used for dying are run off into the brook. There are eleven or

twelve tubs. The cause of the daily discoloration is mostly the rinsing of the goods after they have been dyed. This occurs twice a day. The effect of this is to greatly discolor the water as it runs past plaintiff's premises. Different colors, pink, red and green appear. The color of the water is seen upon ducks which go into the stream. Bottles of the water taken from the stream below the defendant's manufactory were produced on the argument of the appeal, showing much discoloration and flocculent matter, which subsided into a sediment when the bottles were allowed to stand still. If the bottles presented on the argument contained fair samples of the water (and the testimony shows how the samples were taken) no one would be willing to use the water for any domestic or culinary purpose. The fact of such discoloration is hardly disputed, and is found by the court.

The court found that the plaintiff's property is barren and unproductive; that he paid therefor $2,210, and that it is worth not over one hundred dollars; that the discharge of this colored water is necessary to the convenient and successful use of the factory; that the plaintiff does not put the stream to any use, and is not likely to be injuriously affected by this use of defendants; that their use is reasonable and does not harm plaintiff.

Something is said on defendants' behalf to the effect that the stream is also polluted from other causes. It appears that two streams unite above plaintiff's property. One from the south-west is pure and clear. The other from the north-west is said to be made impure by cess-pools and the like of the village of Milton. The defendants, therefore, carried the water of this latter stream around the pond and discharged it below their factory. For they found that pure water was needed for their work. But it is not a defense to defendants that others also pollute the stream. (*Chipman* v. *Palmer*, 77 N. Y., 56.)

It seems to us that in the defendant's argument they have not observed the distinction between the use of the water of a stream and the extent of such use, permissible to all riparian owners, and the defiling or polluting the water so as to make it foul where it passes through land of riparian owners below.

It is undoubtedly true that the riparian owner has a right to a reasonable use of the water, although this may cause some injury to

the owner below. For instance, using a stream for domestic purposes or for watering cattle is permissible, although this may diminish the amount received by other riparian owners. So, too, the use for propelling machinery is permissible although this may also diminish the amount which flows beyond. (*Bullard* v. *Saratoga Victory Mfg. Co.*, 77 N. Y., 525.) These uses are all reasonable as to the quantity of water which will probably be detained. So, in *Prentice* v. *Geiger* (9 Hun, 350; affirmed, 74 N. Y., 341), an action was brought to recover damages because the plaintiff averred the saw-dust from defendant's mill filled up plaintiff's mill-pond. The plaintiff had a verdict. Some question arose as to a presumptive right to throw saw-dust into the stream. The jury found that defendant's use was unreasonable, and this was sustained on appeal. It will be seen that the injury complained of was not the pollution of the water by foul substances, but the filling of plaintiff's pond. So that the remarks of the court have little reference to a case like the present where actual pollution is charged. The use of water to drive machinery is a very different thing from the discharge of polluted water into a stream. The owner who only uses the stream to drive his machinery or water his cattle lets the water go on to the next riparian owner in the same healthful condition in which it was received. But he who pollutes it with foul matter deprives the next owner of his right.

But it may be said that the watering of cattle in a stream tends to pollute it and even that the flow of water through a mill-wheel might have that effect. But these are trivial and incidental matters. They are practically of no moment and are only indirect effects of a proper use of the stream. Still more, perhaps, the washing of sheep in a stream might pollute it. But that is only an occasional occurrence, necessary and proper in agriculture and temporary in its effect upon the water. It is entirely unlike the acts of the defendants.

The question, then, is whether a riparian owner may lawfully discharge, day after day, foul and discolored water so great in quantity that it pollutes the stream as it passes through the land of the owner below. We think not. Such owner is entitled to have the stream in its natural purity. *Chipman* v. *Palmer* (*ut supra*) was a case of the pollution of a stream. (See *Duke of Buccleugh* v. *Cowan*, 5 Macph., 214.) The doctrine is asserted in *Crossley & Sons* v.

*Lightowler* (5 L. R., 3 Eq., 279), where it was even held that a riparian owner having a right (*i. e.*, by prescription) to discharge foul water into the stream, if he sells land on the bank cannot continue to pour refuse into the water in front of the land sold, even though the water be not in actual use by the purchaser.

To the same effect is *Pennington* v. *Brinsop Hall Coal Company* (L. R., 5 Chan. Div., 769). The plaintiff claimed the right to enjoy the stream in its purity. The defendants pumped water into it. containing deleterious matters. But they claimed that if they were restrained they would have to close their colliery at a loss of £190,000, while the injury to plaintiff was not more than £100 a year, yet the injunction was granted. It seems to us clear, on principle and on precedent, that a riparian owner has a right to restrain the systematic pollution of the stream by one who is above him. Injunction is the common remedy against a nuisance. The reason is that otherwise there would be frequent actions for damages, and, further, that the remedy by common-law action is not adequate. It would be utterly inadequate in a case like the present; and it always must be where the nuisance has been, and will in the future be, continuous. But it is urged by defendants that no actual damages to plaintiff is shown. The cases hold that this is not necessary to support an injunction in such instances. The plaintiff's right is interfered with. Unless stopped the interference may grow into a right by prescription. (*Brickett* v. *Morris*, L. R., 1 Scotch App., 47; *Crossley & Sons* v. *Lightowler, ut supra*; *Pennington* v. *Brinsop Hall Coal Co., ut supra*; *Clinton* v. *Myers*, 46 N. Y., 520; *Crooker* v. *Bragg*, 10 Wend., 260.) The same is held in *Harrop* v. *Hirst* (L. R., 4 Ex., 43) in an action brought by one of the public against a riparian owner who interfered with the supply of water. To a similar effect: *Busch* v. *New York, Lackawanna and Western Railroad. Company* (34 N. Y. St. Rep., 7); *Smith* v. *Rochester* (38 Hun, 612), where numerous authorities are cited (affirmed 104 N. Y., 674); *Webb* v. *Portland Manufacturing Company* (3 Sum., 189). And as somewhat similar, *Allaire* v. *Whitney* (1 Hill, 482).

Again it is said by defendants that great damages would be caused to them by this injunction. But they have no right to interfere with plaintiff's right in order to make money for themselves. A similar claim had no effect in the Pennington case above cited.

It is urged that plaintiff bought the land when defendant's mill was already in operation. That is immaterial. Defendants could not prevent the vendor from selling his land, with all its rights, by insisting that every purchaser knew of the existing nuisance. It matters not whether the injured party comes to the nuisance, or the nuisance comes to him.

Further, it is alleged that plaintiff's motive in purchasing the land was bad. That is immaterial. "Courts have no power to deny to a party his legal right, because it disapproves his motives for insisting upon it." (*Clinton* v. *Myers, ut supra.*) The plaintiff had a right to buy the land, whatever his motives were. When he became the owner he took all the rights of an owner. One of these was to have the water of the stream unpolluted. Whether or not he uses the land now is immaterial. If he should desire to make any use of the stream requiring (as defendant's use does) pure water, he could not safely make any expenditure until he should have stopped this pollution. If he cannot prevent it, he will be unable to use the stream for any purpose requiring pure water. Therefore, it is not necessary for him to show actual damage or actual use of the stream.

The complaint asks for damages as well as for an injunction. We cannot determine the amount of damages.

The judgment should be reversed, a new trial granted, costs to abide the event.

KELLOGG, J., concurred.

MAYHAM, J. (dissenting) :

This action was prosecuted by the appellant against the respondents to procure a perpetual injunction restraining the defendants from polluting a stream of water which passes over the defendants' land and is used by them, in passing at the factory, in the process of manufacturing plush, and is thereby at times colored by the dyes used by the defendants in coloring their goods, and in that colored condition the water of such stream flows over and across the lands of the plaintiff, which are situate below the factory of the defendants on the same. The stream of water in controversy is formed by the junction of two small streams above the defendants' factory supplying a small dam or pond used by the defendants in running

their factory. The plaintiff's premises, across which this stream flows after leaving the factory of the defendants, consists of a narrow strip of uncultivated land, lying between the defendants' premises and the Hudson River Railroad, which was purchased by the plaintiffs long after the defendants had used this for manufacturing purposes, and had discharged into it refuse dyes in the same manner as that of which the plaintiff complains.

The plaintiff purchased these premises at auction, paying therefor the sum of $2,210, but the trial court found that its present value did not exceed one hundred dollars. The trial court dismissed the plaintiff's complaint, with costs.

The learned trial judge found that, in operating their factory, the defendants occasionally discharged into this stream colored water from their rinsing vats, whereby the water became colored, and in that condition flowed through the lands of the plaintiff.

That such discharge is necessary to the convenient and successful operation of such factory, and that the defendants are greatly benefited by such use of the stream.

That this stream is not put to any use by the plaintiff, and the value of his lands are not materially affected, and the plaintiff has not been, and is not now, and is not likely to be, in any way injuriously affected by such use of the water of this stream by the defendants; and that such use of the stream by the defendants was, under the circumstances of this case, reasonable, and in no way harms the plaintiff.

The plaintiff excepted to each finding of fact of the learned judge separately on the ground that there is no evidence to support it; also to certain refusals to find, as requested by the plaintiff, and to his conclusions of law.

Whether or not the plaintiff had a right, by this action, to perpetually enjoin the defendants from the use of this water, in the manner indicated, seems to depend upon the question whether such use was, under the circumstances, a reasonable use of this stream by the defendants. This reasonable use must not impair the just right of other riparian owners who are also entitled, in like manner, to reasonable use of the stream, without any unreasonable impairment in quantity or quality. The rule upon this subject, which

seems to be deducible from the adjudged cases, is stated by Angell on Water Courses as follows: "It is clearly the duty of riparian proprietors, upon a water-course, to refrain from erecting upon its banks any works which render the water unwholesome or offensive." (Angell on Water Courses, § 136.) But the application of this rule does not prevent the owner of land, over which a stream of running water flows, from the reasonable use of the same for agricultural, domestic, mechanical or manufacturing purposes, even though such use may, in some slight degree, lessen the quantity or deteriorate the quality of the water which flows from his to his adjoining neighbor's land.

The exact extent to which the use of a riparian owner may diminish the quantity or impair the quality of water flowing upon the lands of an owner below is, within the authorities, difficult to determine, and its determination, it seems to me, must depend upon the circumstances of each particular case ; and while a gross and palpable violation of the rights of riparian owners, lower on the stream, would furnish a clear right of action for damages, and perhaps a ground for equitable interference by injunction, still, if the rule were carried to the extent that slight diminution of quantity or slight deterioration of quality furnished in all cases a right of action, the ordinary use of running streams would be greatly diminished and the owners of lands through which they flow be deprived of much of their value. In *Honsee* v. *Hammond* (39 Barb., 95), MILLER, J., in laying down the rule upon this subject uses this language : "Although they (defendants in that case) had the right to use the water for all legitimate and proper purposes, they were not authorized to injure the owner on the stream below."

In *Merrifield* v. *Worcester* (110 Mass., 219), it was held that the natural right of a riparian proprietor to have the water of a stream descend to him in a pure state, fit to be used for the various purposes to which he may have occasion to apply it, must yield to the equal rights of those who happen to be above him on the stream. "Their use of the stream for mill purposes, for irrigation, watering cattle and the manifold purposes for which they may lawfully use it, will tend to render the water more or less impure. Cultivating and fertilizing the lands bordering on the stream, and in which are its sources ; their occupation, by farm-houses and other erections,

will unavoidably cause impurities to be carried into the stream. As the lands are subdivided and their occupation and use become multifarious, these causes will be rendered more operative and their effects more perceptible. The water may thus be rendered unfit for many uses for which it had before been suitable; but so far as that condition results only from reasonable use of the stream in accordance with the common right, the lower riparian proprietor has no remedy." That rule seems substantially to have been adopted in this State. In *Bullard* v. *Saratoga Victory Manufacturing Company* (77 N. Y., 525), the court lays down the rule as follows: "The maxim *aqua currit et debet currere ut currere solebat*, prescribes the general rule in respect to running streams, but it is to be interpreted and applied in connection with another rule which is well settled; that each riparian owner has a right to a reasonable use of the water. * * * Injury to one proprietor in consequence of the use of the water by another is not an invariable test of the right of such use;" and after giving instances, illustrating the rule and exceptions, the court adds: "The question of reasonable use most frequently arises between mill owners on streams which afford a power available for the propulsion of machinery. The maxim that water should be allowed to flow, as it is wont to flow, if strictly construed and applied, would prevent the use of such streams for manufacturing purposes. * * * The question of reasonable use is ordinarily a question of fact to be determined upon a consideration of all the circumstances."

The learned trial court, which, in the first instance, was charged with the duty of determining this question of fact, has expressly found that the defendants' use of the stream is, under the circumstances, reasonable, and in no way harms the plaintiff. In reaching this conclusion he might properly take into account and give due weight to the fact that the defendants had established their plant and were conducting their business in a manner that made their use of the stream in this way an apparent necessity at the time of the purchase of the plaintiff's premises by him, especially when the relief sought by the plaintiff would tend to a complete destruction of the defendants' business.

The injury which the plaintiff has or will sustain, by reason of the acts of the defendants complained of in this action, bears no

comparison to that which would be inflicted upon the defendants by the granting of a perpetual injunction; and while the law will not sanction a wrong or protect a wrong-doer in its commission, even though the injury inflicted is slight and the advantage to the wrong-doer is large (*Corning* v. *Troy Iron and Nail Factory,* 40 N. Y., 204), yet the process of injunction, as said by the learned trial judge, should always be applied with caution, and only when there is established a clear right to such relief and the apparent danger is imminent. Equity employs the process of injunction to prevent an irreparable injury only. (*Drake* v. *R. R. Co.,* 7 Barb., 508.)

In *McLaury* v. *Hart* (121 N. Y., 636); *Morgan* v. *City of Binghamton* (102 id., 500); *Purdy* v. *Manhattan Elevated Railroad* (36 N. Y. St. Rep., 43) it was held that, in order to give the plaintiff a right to injunctive relief, it is necessary to establish a substantial injury, and not merely a technical wrong calling for nominal damages, and this whether the injury be single or continuous, and whether it be the subject of only one or of successive actions.

In *McLaury* v. *Hart* (*supra*), FINCH, J., says: " Equity wields the powerful process of injunction to prevent irreparable injury." In the case at bar the court has found that the plaintiff is in no way harmed by the defendants' use of this water. Whether this court, as an original question, would have reached the same conclusion is unnecessary to inquire here. It is quite manifest that the plaintiff has suffered no irreparable injury, nor does it appear from the evidence that any such injury is imminent. But it is urged by the plaintiff that if the injunction is not granted restraining the defendants from this use of the water of this stream there is danger of the continued use in this manner ripening into a prescriptive right in favor of the defendants. If this were so, we do not think that a sufficient reason for granting an injunction under the circumstances of this case. If the plaintiff's legal rights are invaded, their assertion and establishment in an action at law would effectually prevent the attaching of a prescriptive right to this use of the water and protect the plaintiff from any such apprehended consequence.

I am, for the reasons stated, led to conclude that the plaintiff's complaint was properly dismissed.

Judgment reversed, new trial granted, costs to abide event.