STROBEL et al., Appellants, v. KERR SALT CO., Respondent. (Supreme Court, Appellate Division, Fourth Department. December 18, 1897.) Action by William D. Strobel and others against the Kerr Salt Company. Appeal by 8 of the 14 plaintiffs from a judgment entered upon a decision of the Wyoming special term, dismissing the plaintiffs' complaint. The action was to restrain the diversion of the waters of the Oatka creek, which passed through the towns of Gainsville, Warsaw, Middlebury, and Covington, in the county of Wyoming, the towns of Pavillion, Stafford, and Le Roy, in the county of Genesee, and town of Wheatland, in the county of Monroe, and from polluting the waters of said stream, by the respondent, a corporation engaged in the production of salt at the upper end of the said stream. The plaintiffs were the owners of about 14 grist mills, a saw mill, plaster mill, and woolen mill upon the said stream, that had been in existence many years prior to the discovery of salt in that section, which discovery occurred in 1879 or 1880. In 1886 and 1887 the defendant built a large structure at a point on the stream just below where two other streams intersecting formed the Oatka creek. It built a large structure, sunk 7 wells to a depth of about 2,000 feet, where the deposit of solid salt was found. The method of producing salt is as follows: A casing is sunk in the well of a diameter of 5⅜ inches, in which is inserted a tube of a diameter of 3½ inches. Between the casing and the tubing fresh water from the stream is forced to the rock below, dissolving it into brine. The brine is then forced to the surface, and put into large open tanks, for the evaporation of the brine by exposure to the atmosphere, during which time it receives treatment by quicklime for the precipitation of impurities. It is then put under shelter, and subjected to the application of artificial heat, and the water forced out of it in the form of steam, which afterwards becomes condensed, and the water restored to the stream. The last year preceding the trial of the action (which was in 1893), the defendant produced between 43,000 and 44,000 tons of salt, being a daily average product of about 860 barrels. The full capacity of its works was 1,200 barrels daily. A sufficient amount of brine of the strength of 95 degrees to produce a barrel of salt is 13.35 cubic feet. That is, that quantity of water must be evaporated to produce a barrel of salt with a brine of 95 degrees. Soon after the erection of defendant's salt works, other salt works were constructed by other parties below and upon the same stream to number of 10 or 12 that used the waters of this stream in the production of salt in the same manner as the defendant does. The plaintiff Munger's mill is situate nearest the defendant's salt works, and a mile and a half therefrom, and is the only mill of the plaintiffs between it and the salt works below. The nearest mill of the appellants to the defendant's salt works is that of the appellant Flora Hook, which . is about 10 miles from the defendant's works. The other appellants have mills further down the stream. The distance upon the stream occupied by the plaintiffs' mills and the various salt works is from 30 to 35 miles. The trial court made its decision in writing, embracing certain findings of fact and other findings upon request to find. After stating the course of the stream, and referring to the manufactories of the plaintiffs, among other findings are the following: "That the plaintiffs severally own, operate, and for several years last past before the beginning of this action owned and operated, mills and manufactories situated at different points upon the stream known as 'Oatka Creek,' and each of said plaintiffs have been accustomed to use the waters of said stream for ·obtaining power in operating his said mill or factory. The supply of water flowing into said creek varies in amount in different years and in different seasons of the same year. * * * That all of the drainage of the valleys below the defendant's salt works flows into the said Oatka creek, and the amount of water flowing in the stream increases below the defendant's said salt works to the point where it flows into the Genesee river, except that at one place above some of the plaintiffs' said mills or factories in dry seasons the flow of water in said stream wholly

ceases for a time. That the premises of the defendant and its salt works lie in the valley of the said Oatka creek, and the said works stand near the said creek, and the natural drainage therefrom is into said stream. That in the process of manufacturing salt, water containing salt in solution has flowed by such natural drainage from said works into said stream. That since the beginning of this action the defendant has constructed a trench between its works and the said stream, so located and constructed as to carry any water containing salt in solution that might escape by drainage from defendant's works into the said salt wells. * * * That the configuration of the ground on either side of the stream is such that the water or vapor escaping from said boilers or grainers as it condenses into water naturally returns to the same stream." This last conclusion was found with reference to the proof that on either side of the valley where the defendant's works were located hills rose to the height of 150 feet, and between these hills the evaporation occurred in the process of producing salt. The trial court further held that the defendant had not diverted the stream except in manufacturing the salt, and had not permitted the escape of any foreign substances into the stream, except by the natural drainage from its own lands; that the use of the waters of the creek made by the defendant was a proper and necessary use of the same in the transaction of its business, such as it was lawfully entitled to make, and by such use it had not perceptibly or materially diminished the natural flow of the water, and had not unlawfully polluted or diverted the stream to the prejudice of the plaintiffs; that the plaintiffs were not entitled to an injunction, nor to the relief demanded in the complaint. Damages were not claimed in the complaint, but were expressly reserved therein for subsequent actions. Theodore Bacon, for appellants. Norris Morey, for respondent. No opinion. Judgment affirmed, with costs.

WARD, J. (dissenting). The disposition of this case involves the consideration of the rights and interests of the parties to this appeal in the waters of the Oatka creek. It would not ordinarily seem to be necessary at this period of our jurisprudence to state the law governing the rights and duties of riparian owners along the fresh-water streams of this state, but the novel conditions which this case discloses, and the application of its facts to the law regulating water courses, seem to render it necessary, and we shall first consider the law governing the case, and then refer to the facts. "Every proprietor of lands on the banks of a river has natural and equal rights to the use of the water which flows in the stream adjacent to his lands as it was wont to run (currere solebat) without diminution or deviation. No proprietor has the right to use the water to the prejudice of other proprietors above or below him unless he has a prior right to divert it, or title to some exclusive enjoyment. He has no property in the water itself, but a simple usufruct while it passes along. 'Aqua currit et debit currere ut currere solebat' is the language of the law. Though he may use the water while it runs over his land, as an incident of the land, he cannot unreasonably detain it, or give it another direction; and he must return it to its ordinary channel when it leaves his estate. Without the consent of the adjoining proprietor, he cannot divert or diminish the quantity of water which would otherwise descend to the proprietor below, nor throw back the water upon a proprietor above, without a grant, or uninterrupted enjoyment for twenty years, which is evidence of it." 3 Kent, Comm. (13th Ed.) 439. The same rule is announced by Judge Story in Tyler v. Wilkinson, 4 Mason, 397, Fed. Cas. No. 14,312, and it is affirmed by the decisions of the courts of this state. Bellinger v. Railroad Co., 23 N. Y. 42; Clinton v. Myers, 46 N. Y. 511; Covert v. Cranford, 141 N. Y. 521, 525, 36 N. E. 597; Gilzinger v. Water Co., 66 Hun, 173, 21 N. Y. Supp. 121; Townsend v. Bell, 62 Hun, 306, 17 N. Y. Supp. 210; O'Riley v. McChesney, 3 Lans. 278, 282; Carhart v. Gaslight Co., 22 Barb. 297; Smith v. Cranford, 84 Hun, 318, 32 N. Y. Supp. 375; Standen v. Water Co. (Sup.) 35 N. Y. Supp. 92; High, Inj. § 794; Garwood v. Railroad Co., 83 N. Y. 400; Smith v. City of Rochester, 92 N. Y. 463. Nor do the cases of Prentice v. Geiger, 74 N. Y. 341, McCormick v. Horan, 81 N. Y. 86, Booth v. Railroad Co., 140 N. Y. 267, 35 N. E. 592, in all of which Judge Andrews wrote the opinion of the court, and cited by the learned counsel for the respondent, conflict with the rule thus laid down. Judge Andrews, in Covert v. Cranford, supra, expressly reaffirms the doctrine of the common law as laid down by Kent in the following statement: "The maxim, 'Aqua currit et debit currere,' says Denio, J. in Bellinger v. Railroad Co., supra, 'absolutely prohibits all individuals from interfering with the natural flow of water to the prejudice of another riparian owner upon any pretense, and subjects him to damages at the suit of any party injured without regard to any question of negligence or want of care.'" This Judge Andrews quotes with approval. The trial court in the case at bar seems to have reached the conclusion that the strictness of the early laws as to water courses has been modified in favor of large combinations of capital or corporations who sought to carry on their business operations as those operations were beneficial to the public, and that, where the rights of small mill owners, manufacturers, or property holders come in conflict with those operations, they were not to be regarded with the same strictness, or afforded the same protection, as under the ancient law, provided the public good required it. This argument is earnestly pressed upon this review by the learned counsel for the respondent. The learned trial court cites an Indiana case (Barnard v. Sherley, 135 Ind. 547, 34 N. E. 600, 35 N. E. 117), which was a case where the defendants sunk an artesian well on their own premises, and turned the water into a small stream that flowed across the plaintiff's land, and which was the only natural possible means of escape. Afterwards the water was found to have medicinal properties, and a sanitarium was erected for the treatment and bathing of persons afflicted with various diseases. It was held that the defendants were not liable for allowing the water so polluted to flow into the stream, there being

no negligence or malice, and all due care being used to avoid the injury. The trial court also quotes Coal Co. v. Sanderson, 113 Pa. 145, 6 Atl. 453, where water pumped from coal mines and discharged into a stream by a coal corporation was sanctioned by the courts; and also an Alabama case of a similar character (Iron Co. v. Dye, 87 Ala. 470, 6 South. 192). After reviewing those cases, the trial court, in its opinion, seems to approve the following: It says: "The court [the Indiana court] laid down this proposition: Where a work is lawful in itself, and cannot be carried on elsewhere than where nature located it, or where public necessity requires it to be, then those liable to receive injury from it have a right only to demand that it shall be conducted with all due care, so as to give as little annoyance as may reasonably be expected, and any injury that may result notwithstanding such care in the management of the work must be borne without compensation. It is, then, a case in which the interests and convenience of the individual must give way to the general good." We have the right to look into this opinion of the trial court to ascertain the views of the court upon which its decision was founded. The learned trial court could hardly have considered the full effect of the conclusion it reached. As applied to the case at bar, it means simply this: that upon the discovery of this salt deposit 2,000 feet beneath this stream, the defendant, well knowing the existence of the plaintiffs' mills and their long use and appropriation of the waters of the stream in their business, and being bound to know the law governing the rights of parties in that regard, devotes the stream to a use hitherto unknown, and which could not have been anticipated by any of the prior occupants of the stream; and in carrying on a large and profitable business converts a fresh-water stream into a salt-water stream, to the manifest injury of the mill proprietors below, without compensation to them, or condemnation of their rights, which amounts to a certain extent to the confiscation of their property. Carrying this principle further, license would be given to any other combination of capital to crush out the little holders and individuals under the specious pretext of the public good. Examples of the pernicious effects of such a doctrine might be multiplied indefinitely. They will readily occur to a reflecting mind. We cannot disguise the fact that, while the growth of corporations and vast combinations of capital in this country has useful, nay, indispensable, features, yet their tendency is to crush out the individual, and advance their own interests. At least this idea has taken hold of great numbers of our people, especially the laboring classes, and the mutterings of discontent, if not revolution, are heard in every direction. The people, in this emergency, turn naturally to the courts, as just and conservative bodies, to protect alike the individual and the combination, and the courts must perform that duty. The loose doctrine as to the invasion of private rights which seems to be inculcated by the cases we have last considered does not correctly state the law of this state. In this state, beyond the range of the maxim, "De minimis non curat lex" (the law regards not mere trifles), wherev-

er the citizen suffers substantial damage from the act of another the law affords redress. If the damages are capable of being ascertained in an action at law, redress must be had in such an action. If, from the nature of the act committed or threatened, justice cannot be done, or the damages accurately ascertained, or irreparable mischief be threatened, or a multiplicity of suits might result, equity may be invoked, and the restraining power of the court called into exercise. The strict rule of the common law as to water courses has not been modified, but it has been amplified and extended to reach, as far as justice and equity would permit, the changed and ever-changing conditions that the growth of a great country manifests, and the exhaustive opinion of Grover, J., in Clinton v. Myers, supra, reviews this subject, pointing out the new cases to which this law has been applied, and other cases have arisen where the courts have done the same thing, but in no case has the right of the individual, however humble his station or inconsequential his business, been sacrificed to meet the emergencies or wants of combinations of capital. The Pennsylvania supreme court at an earlier time announced the correct doctrine in Wheatley v. Chrisman, 24 Pa. St. 302. In that case the defendant claimed that he had a legal right to use a reasonable quantity of water for the purposes of his business, but it was held that his business might reasonably require more than he could take consistently with the rights of the plaintiff, and that the reasonable use should be with respect to the rights of others. Black, J., said: "We cannot see how, or on what principle, the correctness of this can be impugned. The necessities of one man's business cannot be the standard of another's rights in a thing which belongs to both. * * * The defendant has the right to such a use as he could make of the water without materially diminishing its quantity, or corrupting it in quality. If he needed more, he was bound to buy it. However laudable his enterprise may be, he cannot carry it on at the expense of his neighbor." This statement seems peculiarly appropriate to the conditions existing upon Oatka ʼcreek. That the corporate interests that have invested the large amount of capital in the development of salt in that region should be anxious to preserve the advantage they have asserted of manufacturing salt largely at the expense of their neighbors not engaged in that business, is not strange; that the villages and sections of country benefited by this salt development should be anxious to maintain it at all hazards, we can understand; but we have not the right to overlook the right of the citizens engaged in other kinds of manufacturing upon this stream to enjoy their property, and be protected from harm, whatever disadvantage it may be to other parties. The defendant made the investment and took its chances with its eyes wide open to any possible consequences that might result as an infringement of the rights of the mill owners through its salt operations. A high English court has stated the right doctrine in Attorney General v. Borough of Birmingham, 4 Kay & J. 528. In that case it was argued that a great city like Birmingham should not have the escape of its sewage

cut off because of the inconvenience of owners of lands upon which it was turned, and Vice Chancellor Page Wood said: "So far as this court is concerned, it is a matter of absolute indifference whether the injunction will affect a population of two hundred and fifty thousand or a single individual carrying on a manufacture for his own benefit." And see Evans v. Merriweather, 3 Scam. 495; Satterfield v. Rowan, 83 Ga. 187, 9 S. E. 677; Railroad Co. v. Hamilton (Ala.; 1893) 14 South. 167. In the last case a corporation using the waters of a stream for washing ore in such a manner as to foul the water so that the stock would not drink, and destroying it for domestic purposes, it was held liable for the damage sustained, although the ore was valueless without washing, and the stream furnished the only available water supply for the purpose, and the company used the customary and best means for purifying the water after being used. This case would seem to indicate a different view of the question we are considering from Iron Co. v. Dye, 87 Ala. 468, 6 South. 192.

We are now brought to a consideration of the facts in this case as disclosed by the evidence. A large number of witnesses, including the plaintiffs, millers and other persons familiar with the operation of the plaintiffs' mills, testified that they had long been acquainted with Oatka creek, its supply of water, the operations of its mills, and the effect of the water upon the mill gearing, wheels, and machinery. They are quite clear and uniform in the statement that before the establishment of the salt works of the defendant and others the supply of water was much greater in the Oatka creek than afterwards. In one case the witness stated that he had not been able to grind more than one-half as much grain at his mill during the same period of time after the salt works were constructed as before. It does not appear that the condition of the country as to being cleared had changed to any extent for several years preceding the building of the salt works and since that time, so as to affect the water conditions. The trial was in 1893, and the witnesses stated that for six or seven years before the trial the supply of water was greatly diminished from what it had been for a series of years prior to 1886. These witnesses testified also that the iron upon the mill machinery, and connected with it, that had been exposed to the salt water, had rusted, scaled, and been eaten out and otherwise injured to a much greater extent than had occurred before the salt was introduced into the stream. This evidence came from men who operated the mills, tested the water, and were interested in knowing what caused the difference in the condition of the iron and machinery which they observed. They did not indulge in any speculations or theories, or assume to give expert testimony, but they stated the facts, from which it clearly appeared that, as a result of the establishment of the defendant's salt works and others, positive damages came to the mill owners in two respects: First. Such an appropriation and diversion of the water of the creek as seriously crippled their ability to carry on the works of the plaintiffs, and thus diminishing, if not utterly destroying, the profits of their business, and in

seasons of low water and drouths they had to suspend their business very largely for want of water,—a condition that had not existed to any such extent prior to the establishment of the salt works. The extent of this diversion is not accurately ascertained, but the chief expert for the defendant testified that at the defendant's works the loss of water was 103⅔ gallons per minute, none of which was restored to the stream, unless it was embraced within the condensed vapors that were retarded in their flight by the configuration of the hills, and thus returned to the stream. Even this calculation would create a loss of 149,280 gallons, or 4,739 barrels, each 24 hours, at the defendant's works; and adding to this the loss upon the same basis of 12 other establishments, all producing salt, and using the waters of the creek for that purpose, it is readily seen that the diversion must have been of a very serious character at moderate or low stages of the water. The tendency of the plaintiffs' proof was to show a much larger abstraction or diversion from the waters of the creek. This, it will be observed, was not an ordinary use of water by the upper proprietor, where the only loss is the evaporation of water from ponds or races, where the water is temporarily detained, and then the water restored to the stream below in substantially the same condition as it was obtained from the stream above,—simply use of the water, so to speak; but here the water is supplied through wells to the bowels of the earth, pumped up again, its character changed, and large quantities of the water never returned to the stream. The other ground of complaint is the pollution of the water of the whole stream by reason of the manufacturing by the defendant and others of salt. It is said by the learned counsel for the respondent—facetiously, as we suppose—that "salt is neither defiling nor corrupting"; on the contrary, it is "purifying and preserving." In this we concur, if it is applied to the legitimate purposes for which salt is used; but the corroding tendencies of salt upon iron, and its effect upon boilers where salt water is used, can hardly be questioned from the evidence in this case. It is established by a great preponderance of the evidence, and by the most satisfactory evidence, that the waters of this stream have been substantially changed by the salt which in some manner gets into this stream from the salt works; that it is unfit for drinking purposes, injurious to machinery to such an extent that bolts, spikes, valves, and other apparatus connected with mill machinery have had to be frequently repaired and renewed at much expense and delay to the mill owners, —a condition of things which did not exist prior to the introduction of the salt works. A witness for the plaintiffs (Prof. Lattimore, of Rochester) made an analysis of 44 bottles of water that had been selected at different points from Oatka creek, and some of them between the mill of the plaintiff Munger, whose mill was the highest up the stream, and the defendant salt works, all the other salt works being below Munger's mill; and a table is given in the evidence of the result. A few of the results showing the number of grains of salt to the gallon of water we give: No. 7, 14,152.03 grains; No. 13, 5,038.09 grains; No. 16, 2,422.-

53 grains; No. 32, 6,396.90 grains; No. 33, 8,-889.26 grains; No. 34, 3,776.67 grains; No. 43, 1,934.41 grains; No. 44, 5,201.96 grains. The lowest amount ascertained from any of the specimens was .93 grains per gallon; No. 23, 1.75 grains; No. 14, 2.33 grains. Three other specimens were less than 50 grains of salt per gallon. All the others were above 50 grains, and mostly several hundred grains, per gallon. A table was prepared by a chemist,—a witness for the defendant,—who produced a table showing the results of water that had been taken from the stream and analyzed. The result of this analysis seemed to be that the water contained considerable less salt per gallon than Prof. Lattimore's tables indicated. It was apparent, however, that the difference in the quantity of salt found in the specimens was due to the places from where the water was taken. A little care on one side could have found water where fresh water was pouring in from little streams that emptied into Oatka creek, and the other specimens could have been obtained from parts of the creek not so replenished. But these analyses, together with the evidence of witnesses who tasted the water, and saw its operations, leave no doubt but what the water of the creek was quite salty, in some places more than others, perhaps, but its character was changed substantially from fresh to salt water, and the only question upon this branch of the case is the effect of this water upon the rights and property of the plaintiffs. A careful review of the testimony discloses a failure of the defendant to meet the plaintiffs' testimony in this regard. Its witnesses were principally experts, who advanced theories and stated experiments that had been made both as to the diversion of the water and the effect of salt water upon the machinery. The chief expert for the defendant was Prof. Wittham, an hydraulic engineer, residing in Philadelphia. His experience with salt water had been principally with sea water as connected with vessels. He testified that he had discovered but little damage from sea water to boilers and other machinery of ships. Dr. Frank P. Van Denburgh, another expert witness for defendant (a chemist residing in Buffalo), stated that he had made analyses of sea water taken from both the Atlantic and Pacific Oceans; that the Atlantic sea water contains 1,670.55 grains of salt per gallon, while the Pacific water contains 1,422.56 grains per gallon. It will be observed that there was a much less quantity of salt per gallon in sea water than in several of the specimens analyzed by Prof. Lattimore which we have given. Wittham testified to an opinion that sea water would produce no greater corrosive effect upon machinery than fresh water, and in some respects he would prefer salt water to fresh; while Van Denburgh, on the other hand, testified that salt water was frequently used on shipboard in connection with machinery from necessity, but the quantity of chloride (the name given to the corrosive substance contained in salt) is so excessive in that case that it was not desirable, and positively objectionable; that he should not think of using sea water in boilers if he could get fresh; that there would be double reason for this,—the fuel consideration, and also the action of the chloride

upon the iron. He was unwilling to give an opinion as to how many grains of salt in water would create this corrosive condition, but he did not think that 50 grains of common salt to the gallon would produce that effect. This conflicting evidence of the two distinguished experts we have named shows the unsatisfactory nature of this class of evidence. It is far less convincing than the evidence of facts which our senses recognize as establishing propositions which no amount of expert testimony can overthrow. We shall not attempt to advert to the testimony in this voluminous record further than to refer to a number of specimens of iron, pipe, valves, etc., that were produced upon the trial, and which we have examined. Several of these specimens disclose incrustations of salt, others have indications of decay and injury, the cause of which is not very apparent, but the tendency of the evidence of these specimens is to strengthen the testimony of the plaintiffs as to the effect of salt water upon iron.

But it is urged by the learned counsel for the respondent, and suggested in the opinion of the trial court, that the defendant is not alone responsible for the conditions of the waters of the creek; that all the other salt works have contributed to that result, and that it is impossible to determine the exact measure of the defendant's responsibility, either for the diversion of the water or its condition; that it also appears that sewerage from the village of Warsaw, and other impurities, have passed into this creek, which contribute to the difficulty of fixing any responsibility upon the defendant. This argument is often advanced in cases where a number of persons or concerns contribute to a common nuisance, and it is sometimes difficult to apportion the damage where but one of the wrongdoers is sued. This, however, is not an action to recover damages, but an action brought against defendant to enjoin it against diverting the waters of the stream and corrupting it. Damages are expressly left to other actions. The purpose of the plaintiffs is to establish the right to enjoin the parties guilty of this wrong, and it is sufficient for the purposes of this action to show, as has been shown in this case, that the defendant has contributed to the diversion and pollution of this stream. Crossley v. Lightowler, 2 Ch. App. 478; Rubber Co. v. Rothery, 132 N. Y. 293, 30 N. E. 841. The evidence shows without dispute the salty condition of the water between the defendant's salt works and any of the structures below. The action can be maintained for the purpose of securing relief by injunction without coupling with it a claim for damages, and, if it appears that a substantial right of the plaintiffs has been affected, which, under the rules governing courts of equity, entitles the plaintiffs to a permanent injunction, the court should grant it. High, Inj. § 795; Rubber Co. v. Rothery, supra; Townsend v. Bell, supra; Wilts & Berks Nav. Co. v. Swindon Waterworks Co., 9 Ch. App. 451; Crossley v. Lightowler, supra; Giltzinger v. Water Co., supra; Woodyear v. Schaefer, 57 Md. 1; Wilcox v. Hausch, 64 Cal. 461, 3 Pac. 108. Injunction is a preventive, not a punitive, remedy. Willard, Eq. Jur. 341. In this case, however, actual damages were proved, although not claimed, the extent of which does

not clearly appear, although one of the plaintiffs' experts establishes, by a table which he presents, the loss of horse power occasioned by the diversion of water by the defendant, and this evidence does not seem to be seriously disputed in the case.

The learned counsel for the defendant earnestly insists that, the trial court having decided as a question of fact that the defendant has only made a necessary and proper use of the stream to carry on its legitimate business, and having held that there was no improper diversion of water or pollution of this stream by the defendant, the decision of the trial court should preclude the appellants upon this appeal from raising the question. In equity actions it is not only the right, but it is the duty, of the court on appeal to examine the evidence, and to decide the case as the law and the testimony require upon the record presented. Matchett v. Lindberg, 2 App. Div. 340, 37 N. Y. Supp. 854. Standen v. Water Co., 91 Hun, 272, 36 N. Y. Supp. 92, is a case somewhat like the present, where the general term reviewed upon the facts the special term, and reversed its judgment, and is authority, too, upon the proposition that the title of the riparian proprietor to his water rights in the stream, and his right to redress for their invasion, are not conditional upon the beneficial user of them. There is an exception to the conclusions of law of the trial court; and the decision of that court that the use made by the defendant was a proper use of the same in the transaction of its business, such as it was lawfully entitled to make, and dismissing the complaint upon the merits, brings the legal questions before us which we must dispose of. We have reached the conclusion that the judgment appealed from should be reversed, and a new trial granted, with costs to abide the event.