MANN v. RETSOF MIN. CO.

(Supreme Court, Appellate Division, Fourth Department. March 21, 1900.)

WATER COURSES—DIVERTING SURFACE WATERS INTO NATURAL STREAM—POLLUTION OF STREAM—RIGHTS OF RIPARIAN OWNER—TAKING CASE FROM JURY—EVIDENCE.

In an action for damages for diverting surface waters and polluting the waters of a natural stream, to the damage of a riparian owner, plaintiff showed that the stream had its source in a spring, that it had a clearly-defined channel, that there were springs in its bed, and that the water could be depended upon occasionally for the entire year, and always for a considerable portion thereof. Defendant's evidence tended to show that the stream was merely a channel through which the surface waters of contiguous territory flowed, and that the volume of water therein depended entirely upon the season of the year and the condition of the atmosphere. The evidence showed that when the water reached plaintiff's land it was impregnated with salt by soakage, percolation, or otherwise, in its passage over defendant's premises, and that such condition was not discovered until after the erection of the dam by which defendant diverted the surface waters on his land to the stream in question, although salt-mining had been conducted on the same land for several years prior to that time. *Held*, that the court erred in directing a verdict for defendant.

Appeal from trial term, Livingston county.

Action by William Mann, Jr., against the Retsof Mining Company for damages for the pollution of the waters of a natural stream. From a judgment for defendant, plaintiff appeals. Reversed.

The plaintiff is the owner of a farm situate in the town of York, Livingston county; and the defendant is a corporation engaged in the business of mining salt upon certain premises leased by it of the Greigsville Salt & Mining Company, which are situated in the same town, and about a mile and a half northwesterly from the plaintiff's farm. The Delaware, Lackawanna & Western Railroad runs north and south through the defendant's premises upon an artificial embankment some 12 or 15 feet in height, and the defendant's breaker and plant are located a short distance west of this embankment. For a long period of time a ditch or stream known as the "Gray Ditch" has existed in the

vicinity of the defendant's plant. This stream arose west of the defendant's premises, and its course was southeasterly, in the direction of the plaintiff's farm, although it is not claimed that the waters thereof reached the lands of the plaintiff prior to their diversion as hereinafter stated. About half a mile south of the Gray ditch is another water course, known as the "Boyd Ditch," which takes its course on the Boyd farm, west of the railroad, and runs in a southeasterly direction over the premises of one Rippey, and onto the plaintiff's farm at the southwest corner thereof, where its course changes, and for a short distance it runs in a southwesterly direction, and ultimately finds its way into the Genesee river. In 1892 the plaintiff constructed a reservoir upon his farm to receive the waters from the Boyd ditch, his purpose being to provide a constant supply of water for the stock which he raised. The Lackawanna Railroad was built in 1881, but provision was made for the waters of the Gray ditch by the construction of a culvert which was placed in the railroad embankment. Work was commenced on the salt plant in 1890, and the mine was operated for some time thereafter by the Greigsville Company. In the course of such operations salt and salt rock in large quantities were excavated from the mine and dumped upon the premises in the vicinity of the breaker, and under this dump pipes were laid in the channel of the water course, into which the water flowed at the west side of the dump, and thence through the railroad culvert, in the same southeasterly direction in which it had been accustomed to flow prior to the erection of the embankment. In May or June, 1895, the defendant erected a dam across the Gray ditch at a point about 10 feet east of the culvert, and at the same time it constructed a ditch upon the east side of the railroad embankment, about 75 rods in length, 6 feet in width, and 18 inches deep. This ditch ran in a southerly direction, crossed a highway known as the "Peoria Road" by means of pipes which were furnished and laid by the defendant, and just south of the highway it connected with another ditch which had been made by the railroad company for the purpose of taking the surface water from its premises into the Boyd ditch. Shortly after the erection of this dam the plaintiff and other occupants of land along the line of the Boyd ditch discovered that the water of that stream had become so impregnated with salt as to injuriously affect the stock which were accustomed to drink it, and in consequence of this condition of the water the plaintiff was compelled to abandon the use of the waters in the reservoir on his farm, and ultimately to give up the raising of stock. Evidence was given which tended to prove that the contamination of the water in this stream materially affected the rental value of the plaintiff's farm, and it was to recover damages for such deterioration that this action was brought.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and LAUGHLIN, JJ.

Walter S. Hubbell, for appellant.

W. B. Putney and Charles J. Bissell, for respondent.

ADAMS, P. J. The facts set forth in the foregoing statement were virtually uncontroverted upon the trial, and it was held by the learned trial court that they failed to establish a cause of action in favor of the plaintiff. At the conclusion of the evidence, and when it was apparent that a verdict was about to be directed in favor of the defendant, the plaintiff's counsel asked permission to go to the jury upon the following questions, viz.: (1) As to whether the stream which runs through the Gray farm, the waters of which were obstructed by the dam erected by the defendant, was a natural water course; (2) whether the stream which is known as the "Boyd Ditch," the waters of which emptied into and supplied the plaintiff's reservoir, was a natural water course; and (3) whether, conceding that neither stream was a natural water course, the defendant rendered itself liable in this action for the pollution of the waters flow-

ing therein. These requests were all denied, to which rulings the plaintiff's counsel duly and severally excepted, and these exceptions present the questions which are to be determined upon this review.

It will probably be conceded that the last of the above-mentioned requests involved a question of law, rather than one of fact, and that as such it was one which properly belonged to the court to dispose of. It follows, therefore, that the plaintiff's only ground of complaint, if he has any, growing out of the refusal of that request, is, not that the court refused to submit this question to the jury, but that it was erroneously decided, from a purely legal standpoint. The proposition, concisely stated, upon which the plaintiff apparently rests his contention, is that even conceding these two streams to be artificial channels, and designed simply for the accommodation of surface waters, the defendant has no right, under the circumstances of this case, to pollute such waters to the injury of the plaintiff's premises. We are by no means satisfied that this proposition is untenable; for, while it is the undoubted rule that every person has the right to drain the surface waters from his own land, in order to render it more healthful, useful, or productive, and in so doing to alter their course, and cause them to flow in a new direction, and upon the land of a contiguous proprietor, if necessary (Ang. Water Courses, § 108a; Waffle v. Railroad Co., 53 N. Y. 11), yet he has no right to collect such waters from a considerable area by means of a ditch, and then discharge them in a single channel upon the land of his neighbor (Barkley v. Wilcox, 86 N. Y. 140; Bastable v. City of Syracuse, 8 Hun, 587; Carll v. Village of Northport, 11 App. Div. 120, 42 N. Y. Supp. 576); nor can he divert the water of one stream into another, not its natural channel, and thereby subject the lands upon the stream into which the diversion is made to the servitude of a water way for the water thus discharged into it (Byrnes v. City of Cohoes, 67 N. Y. 204; McCormick v. Horan, 81 N. Y. 86). It is not seriously denied (but, if it were, the evidence is such as to warrant the conclusion) that the defendant, by the erection of its dam in 1895, diverted the course of the surface waters upon its premises from the Gray to the Boyd water course, and caused such waters to flow in a polluted state onto the plaintiff's land; and, this being so, we do not see why the case does not fall within the principle of the rule laid down in the case of McCormick v. Horan, supra, to which reference has just been made. But, without deciding this question, we pass to the consideration of another and an equally important one.

The question of whether or not the Boyd stream was a natural water course was certainly one of fact, which the plaintiff was entitled to have passed upon by the jury, and the same might, perhaps, be said with equal propriety of the Gray stream; but inasmuch as the waters of that stream have been completely obstructed and diverted into the Boyd ditch, and it clearly appears that the injury to the plaintiff's land is attributable to such obstruction and diversion, the character of the Gray ditch, so far as this case is concerned, is a matter of minor importance. There is probably little, if any, misunderstanding as to what constitutes a natural wa-

ter course; but it may be characterized as a stream of water flowing in a defined bed or channel, with banks and sides, having permanent sources of supply, although it is not essential that the flow should be uniform or uninterrupted. Barkley v. Wilcox, supra. Whether or not the stream known as the "Boyd Ditch" falls within this definition is a question which was quite vigorously litigated upon the trial. Upon the part of the defendant it was contended (and much evidence was given to sustain the contention) that it was an artificial, and not a natural, stream; that there was no spring at its source; that its bed or channel was not defined; that in places it appeared to be nothing more than a furrow which had at some time been plowed in order to drain the surface of the adjoining lands; and that upon the Rippey premises the stream widened out into a swale which extended nearly to the plaintiff's line. In short, if the evidence of the defendant's witnesses is to be believed, the jury would have been justified in reaching the conclusion that this stream is nothing but a channel through which the surface waters of contiguous territory have been accustomed to flow, the volume of water therein depending entirely upon the season of the year and the condition of the atmosphere. But, upon the other hand, it is claimed by the plaintiff and his witnesses that the stream had its source in a spring north of Boyd's house; that the water therein had for a long period of time followed precisely the same course until it reached and emptied into the Genesee river; that it has a clearly-defined channel, and that there are springs in the bed of the ditch which supply it with more or less water; that there is a spring on Rippey's land, about 8 rods west of the plaintiff's line, the water from which runs directly onto the plaintiff's premises through a well-defined channel, which will average 2 feet in width and 18 inches in depth; and that the water in the stream could be depended upon occasionally for the entire year, and always for a considerable portion thereof. Manifestly, this character of evidence had at least some tendency to establish a natural water course, and, without intending to estimate the impression it produces upon our mind, it is sufficient to say that it certainly raised an issue of fact upon a question of vital importance in this case; for it will scarcely be denied that if the defendant did divert surface waters from their natural course, and thereby pollute the waters of a natural, running stream, to the damage of the riparian owners, it is liable for such injury as results from its wrongful act. In this connection it is proper to suggest that the present case presents a very different question from the one which arose, and was decided by this court, in Strobel v. Salt Co., 24 App. Div. 626, 49 N. Y. Supp. 1144. There the waters of Oatka creek, a natural stream, were contaminated, it is true, by salt and other foreign substances which came from the defendant's mines; but they reached the stream in the course of natural drainage, while in this case the impurities were diverted by the defendant from their natural course, and caused to flow in a new and opposite direction.

We are not unmindful of the contention so strenuously made and ingeniously supported by the defendant's counsel, that the plain-

tiff's evidence, even giving to it all the force to which it is entitled, fails to establish the fact that the injury of which he complains is attributable wholly or substantially to the diversion of the waters from the Gray ditch. It may be, as claimed, that some of the surface waters from the defendant's land do not find their way into the Boyd stream. But the fact nevertheless remains (and it is one which was conceded by the counsel who prepared the primary brief in behalf of the defendant) that the water, when it reached the plaintiff's reservoir, was impregnated with salt by soakage, percolation, or otherwise, in its passage over' and through the defendant's premises; and it is also made to appear by evidence which is certainly entitled to some consideration that the presence of salt in the water was not discovered until after the erection of the defendant's dam in 1895, although mining operations had been conducted by the defendant's lessor for several years prior to that time.

There are some other features of this case to which reference might, perhaps, be made; but in what has already been said we have indicated so plainly that, in our opinion, it was error to take the case from the jury, that further discussion seems unnecessary.

Plaintiff's exceptions sustained, and motion for a new trial granted, with costs to the plaintiff to abide the event. All concur.