## HARPER, HOLLINGSWORTH & DARBY COMPANY

*v.*

## THE MOUNTAIN WATER COMPANY et al.

[Filed November 27th, 1903.]

1. A verdict against an upper riparian proprietor for abstracting water from the stream by means of wells, rendered in an action in which defendant contended that the bed of the stream and the entire valley were underlaid by a stratum of impervious clay, through which his wells pierced to the subterranean waters, cannot be avoided in a suit by plaintiff to enforce by injunction the judgment at law by additional proof of the existence of the stratum.

2. A lower riparian proprietor sued an upper proprietor for abstracting water from the springs feeding the stream by means of its water-works plant, and, in a second count, for taking water from the stream itself. Evidence was given for plaintiff to show a lessening of the flow, since defendant's plant was erected, above its lower well, and of the withdrawing of water within its "cone of influence," and that the lower well was located over a particular spring. Defendant's evidence tended to show that the diminution in the flow was due to natural causes, and that the entire valley above the lower well, including the stream-bed, was underlaid with a stratum of impervious clay, through which defendant's other wells pierced to the subterranean waters. Defendant also contested the existence of any spring at the lower well. The court instructed on all phases of the case, and the jury returned a general verdict for plaintiff.—*Held*, that the verdict must be taken to have determined that defendant abstracted water by its plant aside from the operation of the lower well, and that the impervious stratum of clay did not exist.

3. A general verdict in a suit embracing two causes of action will be taken, in the absence of anything to show otherwise, to apply to both.

4. Where a lower riparian proprietor has secured a judgment at law determining the maintenance of a nuisance by an upper proprietor in the abstraction of water from the stream, and the continuance thereof works substantial and permanent injury to his property, he is entitled, *as of course, to an injunction to restrain such continuance.*

On final hearing on bill, answer and cross-bill, replication and proofs.

Harper, Hollingsworth & Darby Co. v. Mountain Water Co.

*Mr. Charles A. Reed,* for the complainant.

*Mr. Adrian Riker* and *Mr. Frank Bergen,* for the defendants.

EMERY, V. C.

Complainant's bill is for an injunction to restrain defendants' interference with its rights in the waters of a stream or natural water-course by the diversion or abstraction of the waters of the stream and of the springs and rivulets which in part supply it. These rights and the defendants' interference with them have, as complainant claims, been already established by a suit at law, brought by its predecessors in title, against two of the defendants, under whom the third defendant claims by title or right acquired after the suit at law. In its general aspect, therefore, the bill is filed in aid of a legal right, claimed to be sufficiently established, and to restrain by injunction the continued interference with the rights. Defendants deny any interference with complainant's rights, set up alterations in the operation of their works since the judgment at law and dispute the conclusiveness of that judgment on the question of interference. The substantial facts relating to the water rights claimed, the alleged interference with them and the issues in the suit at law are as follows: Complainant is the owner of a mill-property to which is attached or appurtenant a right to a supply of water from a stream called Green brook, flowing through a valley, sometimes called the Feltville valley, lying west of Summit, between the First and Second mountains. Complainant's mill is not located on the stream, but water is supplied to it by means of a raceway, beginning at a dam in the brook called the Upper Feltville dam, and running about twenty-four hundred feet to the mill. Complainant's right, or that of its grantors, to the water of the stream for use at its mill by means of this raceway was established by the suit at law referred to and has not been contested in this suit. About a mile and a half above the dam the defendants have constructed a water plant which is now used to supply the city of Summit with water. The water supplied is derived altogether by pumping from wells

which have been sunk in the neighborhood of the stream, and in the suit at law it was claimed by plaintiffs, as it is now claimed here by complainant, that by the operation of their pumping plant the defendants abstracted the water from the stream and from the rivulets and springs which supplied it, thus reducing the flow of water in the stream to which complainant's mill was entitled. As the defence in this suit is based mainly on the contention that the verdict and judgment, which were obtained in the suit at law, are not conclusive in this suit, because of the alterations or changes in the operation of their plant since the verdict, it is necessary to make a statement in some detail of the location and character of the different parts of the plant in connection with the stream and its operation at the time of the trial at law as well as at the present time. The works of the water company consist of an artesian well, two open wells, called the upper and lower well, and an infiltration gallery, from which water is supplied to the upper well. About twenty feet from the upper well the pumping plant is located, and from this pumping plant pipes, fifteen to eighteen inches in diameter, connect with three shafts, sometimes called wells in the evidence, located at the two ends and the centre of the infiltration gallery. The upper and lower well are connected by a pipe about sixteen hundred feet long, and at the time of the trial at law water was supplied from the lower to the upper well, a syphon being constructed in the pipe, as the wells were at different levels. The lower well is farther down the stream than any of the other structures and is about a mile and a quarter above the dam, measuring along the bed of the stream. It is thirty feet in diameter, about twenty-five feet deep, and is located about fifty feet south of the stream, whose general direction is from northeast to southwest, through the centre of the valley. On the north side of the stream, about sixteen hundred feet above the lower well and about three hundred and fifty feet from the stream, the upper open well is located. This is thirty feet in diameter and thirty feet deep. Between the upper well and the bed of the stream the infiltration gallery, about five hundred feet long, is constructed of pipes from fifteen to eighteen inches in diameter, laid with open joints to admit passage of the water

31

into it, and laid about twenty feet below the surface of the ground. Three shafts, one from each end and one at the centre, run from the surface of the ground to the gallery. This infiltration gallery runs in the same general direction as the banks of the stream, but, as it is laid on an angle and not straight, the end shafts are about two hundred feet and the centre shaft about three hundred feet from the north bank of the stream. The upper well is located nearly opposite the centre of the infiltration gallery and about twenty feet from it. The north end of the infiltration gallery is the portion of the plant which is located furthest up the stream. The upper and lower wells are open at the bottom but constructed with cement walls which are intended to be water tight. The artesian well sunk near the upper well is a water-tight tubing, extending two hundred feet down into the rock, and its operation is not claimed to affect the water-supply of the stream. The entire works are constructed near the head of the Feltville valley and the sources of Green brook and the ponds, rivulets and springs about the works are thus described or located in the evidence. About two hundred yards up the stream, above the pumping well, there is a pond, called the Frog pond, one of the sources of the stream, into the upper end of which a small rivulet, apparently the source of the stream, flows, and at the lower end of which is an outlet into the stream. The first supply below the Frog pond is a rivulet or stream, running into Green brook from the south and called the Faitoute spring run, which takes its rise from a spring on the rise of ground toward the south; another run or rivulet, about three hundred and fifty feet further south, also runs in upon the same side. These runs are opposite the infiltration gallery. The next stream is one south of the pumping-station and about three hundred yards further down the brook, but running into it from the north and from what is called the Ballantine spring, located about four hundred yards north of the stream. Into the Ballantine spring run, before it reaches Green brook, another small stream, originating apparently in a small pond between the Ballantine spring and the pumping-station, runs into the Ballantine spring run. The lower well is located nearly six hundred feet down the stream from the Ballantine spring run

and, as I have stated, is the structure farthest down the stream. In the suit at law it was claimed by the plaintiffs that this lower well was located over a spring known as the "Boiling Spring," and evidence tending to prove the existence of a spring at this place at the time of the location of the well was produced by the plaintiffs and submitted to the jury. Defendants in the suit at law denied its existence at that time and produced evidence tending to prove this claim. The question of the existence of the spring was left to the jury. After judgment in the suit at law the defendants ceased pumping water from the lower well through the pipe, and the present contention of the defendants is that this change in the operation of their plant has so materially changed the condition which existed at the time of the trial, upon which the verdict was based, that the judgment cannot be taken as conclusive upon the question of the interference at the present time. And the defendants now claim to have produced evidence that by their plant, as at present operated, no water to which complainant is entitled is abstracted from the bed of the stream above the lower well, or from the Frog pond, or from the spring runs that run into the stream above the lower well. They contend, therefore, that on the case as now presented, they have the right to show, and have shown, that no waters to which complainant is entitled are abstracted by them. Complainant, on the other hand, claims that this evidence upon which the defendants now rely to support their claim that they are not abstracting water by the use of the plant other than the lower well, is evidence of precisely the same character as that submitted by them in the trial at law as to the abstraction of waters by the works above the lower well, and that such abstraction of these waters (other than that of the lower well) was an issue tried in that case and adjudged against the defendants. It is not claimed on behalf of the defendants that their disuse of the lower well has had the effect of increasing the supply of water to the complainant's mill, or that the nuisance to its rights by the abstraction of water other than from the lower well, has ceased or been at all affected or changed by reason of the disuse of the lower well. The real claim is that neither at the time of the trial nor at the present time

were the defendants drawing water from the stream or its sources above the lower well.

In this respect the case differs from the class of cases where, after a judgment at law for nuisance, it is claimed, on the application for injunction, that by reason of subsequent alteration the nuisance itself has been abated. In such cases the court will, as a general rule, on the application for permanent injunction, settle the question as to the effect of the alteration and determine the rights of the parties without sending the parties to law for another trial as to the effect of the alteration. *Carlisle* v. *Cooper, 6 C. E. Gr. 576, 588 (Errors and Appeals, 1869)*; *Imperial Gas Light and Coke Co.* v. *Broadbent, 7 H. of L. Cas. 600; 609, 614 (1859)*. But where, as here, the nuisance to the complainant's rights (if it ever existed) still continues, the preliminary question on this application for injunction is really a question as to the effect of the verdict in the suit at law upon the question of the present existence of the nuisance here complained of.

Upon the point now mooted, viz., the question of fact whether the defendants' plant (pumping from the lower well being discontinued) does abstract from the stream and from its natural supplies waters to which complainant's mill is entitled, the precise questions to be decided are—*first,* is the verdict to be considered a decision that these works (other than the lower well) did then abstract waters from the stream to complainant's injury, and *second,* if it is to be so considered, is it now and for the purposes of this application to be taken as conclusive upon this question of fact? In my judgment both these questions must be answered in the affirmative.

The record of the former suit, including the evidence taken and the arguments of counsel on the application for a new trial, have been put in evidence and, by agreement, the evidence taken in that suit has been considered as taken in this suit.

The declaration contains two counts, the first for a diversion or abstraction of the waters of the stream by enclosing springs which supply it and by the erection of a plant (particularly described) which abstracted the waters of the stream and springs; and the second, a general count for the diversion or abstraction

of the waters of the stream by the defendants by their mills, &c. In the second count, abstraction from the springs was not specially charged. To this declaration the general issue was pleaded and a general verdict for the plaintiffs, assessing their damages at $430.95, was rendered.

An examination of the evidence shows that both parties submitted a large amount of evidence as to the effect of the operation of defendants' plant upon the stream and its ponds, springs and runs above the lower well. The evidence of the plaintiffs showed, or tended to show, that since the construction of the defendants' plant the flow of water into the brook had been materially lessened all the way down the Frog pond, and that the bed of the stream below the Frog pond and above the lower well, and also the bed of the rivulets from the springs above this well, were dried up and at different places the streams disappeared. Evidence was also introduced by the plaintiffs, showing or tending to show, the effect of the operation of defendants' pumping plant upon the stream, ponds and runs within what was called the scope or "cone" of its influence, and that the appearances on the surface indicated an abstraction of water by such operation of a pumping plant. As to the lower well, the further and additional claim was made by the plaintiffs, and their evidence tended to show, that the well was located over a spring then existing, called the "Boiling Spring," whose waters ran down into the stream, and that the waters of this spring were directly drawn away from the stream and into defendants' works. Upon the part of the defendants evidence was offered that any diminution in the water-supply to the mill was due to natural causes, such as diminished rainfall, due to clearing of woods and other causes, and as to the abstraction of any water by their works located above the lower well, evidence was offered showing, or tending to show, that the entire bed of the valley at this point, from above the Frog pond to the lower well and across the valley, under the stream, was underlaid by a bed of clay, two feet or more in thickness, entirely impervious to water.

Upon this point Mr. Bassett, called as the manager who built the works as well as an expert engineer, testified that, besides the excavations made for the purpose of constructing the

works, he had made other excavations in the valley to the depth
of six or seven feet which indicated the character of the earth,
and that there was discovered in all these excavations a vein of
close-grained yellow clay at least two and a half feet thick, and
that in the lower part of the valley he had never discovered
any place where there was not this layer of clay near the surface.
He also says that he knows this layer of clay extends from
beyond the Frog pond as far down as the lower well, and that he
believes it extends for a considerable distance below, and that
it extends across the valley. Another engineer, Mr. James
Owen, who examined the ground for the purpose of considering
the direction of the underground flow of water, says that from
near the road above the Frog pond to a point below the lower
well he found the bottom of the brook almost entirely black
muck, resting on an impervious clay; that this clay formation
extended over the valley from near the Baltus Roll road to a
point below the lower well and was impervious to water. It
was testified by both of these witnesses that none or practically
none of the water above this bed of clay was drawn into defend-
ants' wells, and that the sole source of their supply was the water
percolating through the layers or deposits of gravel underneath
the clay. The bed or banks of the stream are about two feet
in depth, and the stream with the spring runs which supply it
(other than the Boiling spring, if this existed) laid above the
clay bed, and it was therefore claimed that as to these no water
that would otherwise have come down to complainant's mill was
abstracted. As to the lower well it was claimed by defendants,
and evidence of witnesses was admitted to show, that the spring
was not in existence when the well was located.

Mr. Chief-Justice Magie, the trial justice, gave to the jury
in his directions the instructions which are, as between these
parties and for the purpose of the present application, the law of
the case. He charged the jury that while the defendants might
strike underground streams and abstract underground water
that might come to the surface and might carry this percolat-
ing water off and sell it, yet if by their works they abstracted
the water or reduced the level of springs or streams that had
come to the surface, it was an actionable wrong if any appreciable

quantity was taken. As to the evidence of such abstraction by underground pumping, he charged the jury that a diminution in the water-supply of the stream, after the erection of the works, was evidence to some extent, and that the evidence of experts as to the contour and formation of the ground, the condition of the soil and the effect of pumping at the upper station was corroborative evidence. As to the lower well, he charged the jury that the case was different, that if there was such a spring which continued down to the time when defendants located their lower well upon it, then they were liable if an appreciable quantity of water was taken; and as to the lower well, he also charged the jury, that if there was no spring there, but the well was so situated and operated as to draw water from the stream or from the pond formed above the dam, when this pond came up around the well, then the defendants were liable to the same extent as for abstracting waters from the stream and springs above the lower well. As to the effect to be given to the evidence offered by the defence, if believed, he charged the jury that if it had been established to their satisfaction that there was an impervious bed of clay, without break, stretching from one side of the valley to the other so that the water in the Frog pond, the springs and in the streams would not penetrate it, and that if defendants had taken nothing but water under an impervious bed of clay, so that the water in the streams, springs and ponds was not taken, then the defendants were not liable. The jury was finally directed that if it was shown by a preponderance of evidence that the defendants had abstracted an appreciable quantity of water which had come to the surface, in a pond, spring or stream, so as to diminish the flow at plaintiffs' mill, and had done this either by the operation of their pump at the pumping-station or by their lower well, or by both, then plaintiffs were entitled to damages for the diminished power and cost to replace it, but if not, defendants were entitled to a verdict. Neither party requested a special verdict or finding as to damages resulting from the operation of the lower well. The entire damages claimed by plaintiffs for the six years before commencing suit was $577 and the verdict of the jury was for $430.95.

On the rule for a new trial (reserving exceptions) argued before the supreme court, the conclusion handed down was (1) that the defendants had no ground to complain of the law laid down by the trial judge as to their liability; (2) that there was proof of an injurious diminution of flow by abstractions, such as were properly held to be actionable, and (3) that the amount of abstraction not being determinable with mathematical precision, the mill-owner was entitled to compensation upon the best obtainable evidence and the amount awarded could not be said to be excessive. The rule was discharged and judgment entered on the verdict and no writ of error was taken. The law as laid down by the trial judge, thus approved by the supreme court, establishes, therefore, the law of this case.

On this application for injunction complainant on its part introduces evidence showing that, as to the flow of water in the stream to the mill, the same condition exists as at the time of the trial at law, and that the defendants are now pumping from the upper well more water than at the time of the trial was drawn from both wells. Expert evidence of the same character produced at the trial at law is produced here on the part of the complainants. Defendants, on their part, show that the lower well is no longer operated, and as to the operation of the pumping plant and other works the ultimate fact or defence claimed to be established is the same as the fact or defence set up at law, viz., that the Frog pond, the bed of the stream, the springs and the rivulets are underlaid by an impervious bed of clay extending down the valley from above the Frog pond to or below the lower well and across the valley to near the sides of the hills enclosing it. The evidence to prove this ultimate fact is in some respects different from that produced in the trial at law and it is claimed to be conclusive. Shortly before the hearing on this suit defendants had the Faitoute spring run and the run below it, and also the bed of the stream itself below the Frog pond, dug out and cleaned, and as a result of this it is claimed that a continuous, unbroken bed of impervious clay is disclosed. Samples of the clay are produced, as in the trial, and the evidence of expert witnesses, Mr. Bassett and Mr. Sherrard, that the bed of clay under the

waters in question is continuous, is also given. No fact different from or other than the fact relied on as the defence at law to the claim of the abstraction of the waters of the stream above the lower well is now set up, and the only difference between the case here and at law is as to the precise character of the evidence to prove the fact. In the suit at law the defendants went to the jury without producing the additional evidence now produced, but which could have been then produced had they desired. In my judgment the effect of the verdict cannot be avoided by the production now of evidence of this character. The verdict and judgment, considered in their bearing as estoppels in subsequent actions, are, according to the authorities on this subject, conclusive not only as to the actual fact or matter decided but also as to facts or matters which it was necessary to decide as grounds for the decision given by the verdict or judgment. *Notes to Duchess of Kingston's Case, 2 Sm. Lead. Cas. (8th Am. ed.) 940; Phillips v. Pullen, 18 Stew. Eq. 830, 834 (Errors and Appeals, 1889); 24 Am. & Eng. Encycl. (2d ed.) 710.*

On this application the verdict is to be examined rather with the view of determining whether the fact now contested was really an issue tried by the parties, and whether the determination of the jury on the fact is to be taken as a sufficient establishment of complainant's legal right and of its violation by defendants. Examining the entire evidence, I conclude that the verdict of the jury must fairly be taken as deciding that the defendants did commit the nuisance now complained of and unlawfully abstract these waters of the stream by the operation of their plant above the lower well and, as included in this, did decide also that the alleged impervious bed of clay did not exist. Cases might occur where evidence, subsequently discovered and not obtainable at the trial, might demonstrate that the verdict of the jury was a mistake and justify the court in sending the case back to another jury for trial to determine the continuance of the nuisance before granting a perpetual injunction, but in the present case the evidence is substantially of the same character as the evidence in the trial at law, and is in effect a second trial with the introduction of additional evidence which

could have been produced at the first trial. I have no right to deprive the complainant of the benefit of the trial at law by reason of the production of this additional evidence. So far as the form of the verdict is concerned, the general verdict, in the absence of anything to show that it was applicable only to one cause of action, viz., the abstraction of water from the lower well, must be taken to have been rendered for all causes of action included in the declaration and to include the abstraction from the stream and ponds above. *Duchess of Kingston's Case, 2 Sm. Lead. Cas. (8th Am. ed.) 928.* Defendants would not have been precluded from showing by extrinsic evidence that the abstraction of waters above the lower well was not in fact an issue and was not tried (*Ib.*), but if the evidence and charge and verdict be considered for the purpose of now determining whether the damages were intended to include damages for the abstraction of waters (other than from the lower well), I think the conclusion must be that they were included, and that the jury decided that the abstraction of these waters now in question was not prevented by the existence of an impervious bed of clay.

Complainant having thus sufficiently established by trial at law its legal right and its violation, and the injury being a substantial one, affecting permanently the use and the value of their property, is, under the general rule applicable to such cases, entitled as of course to a perpetual injunction to prevent the recurrence of the wrong. *Kerr Inj.* \*42; *Imperial Gas Co. v. Broadbent, 7 H. L. Cas. 600, 609, 612.* In *Higgins v. Flemington Water Co., 9 Stew. Eq. 538, 546 (Errors and Appeals, 1883),* it was held that where the court of equity itself settled the question of right and its violation, in such cases an injunction should be granted to protect the continued violation of the right, and that the circumstance that the water was withdrawn for the purpose of a public water-supply was not ground for withholding the injunction. Upon this point the doctrine of *Imperial Gas Co. v. Broadbent, supra,* was approved. The same rule was applied by Vice-Chancellor Pitney in *Hennessy v. Carmony, 5 Dick. Ch. Rep. 616 (1892),* to protect the ownership of land against a continuing injury appreciably affecting its value. The defendants have filed a cross-bill, praying a condemnation

of complainant's right and an assessment of damages by way of compensation. At the hearing the right to have such assessment was denied by complainant, and it was agreed by the parties that the hearing upon the cross-bill should await the determination of the issue of fact as to the continuance of the injury to complainant and its right to an injunction on the strength of the verdict and judgment at law. I will therefore now hear counsel on the application in the cross-bill, withholding any decree for injunction upon complainant's bill until such hearing or until further application.