AMERICAN SMELTING & REFINING CO. et al. v. GODFREY et al.

(Circuit Court of Appeals, Eighth Circuit. November 4, 1907.)

Nos. 2548–2551.

1. COURTS—JURISDICTION OF FEDERAL COURTS—AMOUNT OR VALUE IN CONTROVERSY.

In a suit to enjoin the maintenance of a nuisance, the matter in dispute, for the purpose of determining the jurisdiction of a federal court, is not the damage resulting to complainant from the alleged nuisance, but the right of defendant to maintain the same, and the value of such right determines the amount in controversy.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, §§ 890–897.

Jurisdiction of Circuit Courts as determined by the amount in controversy, see notes to Auer v. Lombard, 19 C. C. A. 75; Tennent-Stribling Shoe Co. v. Roper, 36 C. C. A. 459.

For other definitions, see Words and Phrases, vol. 1, p. 376; vol. 8, p. 7574.]

2. NUISANCE—SUIT TO ABATE—DEFENSE.

In a suit to enjoin the continuance of a business as a nuisance, it is not a defense that the business is in the best place possible for the defendant, or that it is conducted in a proper manner with the latest devices, where the evidence shows that when so conducted it still results in very great damage to, if not the total destruction of, the property of complainants, who reside in the vicinity, and is a menace to health; the rights of habitation being superior to the rights of trade.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, Nuisance, §§ 5, 6, 60–63.]

3. INJUNCTION—OBJECTIONS TO RELIEF—COMPARATIVE INJURY.

The fact that the actual injury resulting from the violation of a right is small, and the interest to be affected by an injunction is large, should not, as a rule, weigh against the interposition of preventive power in equity, when it is clear that on one hand a right is violated, and on the other a wrong committed; and, in a suit for an injunction to abate a nuisance, the question of the comparative injury to the parties from the granting or refusing of an injunction will not be considered on final hearing, where the existence of the nuisance is undoubted, unless in extreme cases.

4. NUISANCE—INJUNCTION—UTAH STATUTE.

The statute of Utah (Laws 1903, p. 521, c. 58), authorizing a court in its discretion to refuse an injunction in a suit to abate a nuisance, on defendants giving a bond to pay all damages recovered, applies only to preliminary injunctions, and cannot be construed to confer upon a court the power to perpetuate for all time a nuisance, which would amount to the taking of private property merely upon the giving of a bond to pay damages.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, Nuisance, §§ 55–58.]

5. SAME—SUIT BY LANDOWNERS—PROOF OF OWNERSHIP.

In a suit by alleged landowners for abatement of a nuisance, where complainants testify without objection to their ownership as well as possession and occupancy of their lands, such testimony, although to a legal conclusion as to ownership, cannot be disregarded, and is sufficient to support the suit.

6. SAME—EQUITY JURISDICTION—IRREPARABLE INJURY.

The injury to owners of land, on which they reside and have fruit and ornamental trees, from a nuisance which endangers their health and destroys their trees is irreparable, and a court of equity is not without ju-

158 F.—15

risdiction to protect them by an injunction merely because they might recover damages in actions at law.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, Injunction, §§ 55–57.]

7. SAME—RIGHT TO INJUNCTION.

Complainants to the number of over 400, owning farms in the same vicinity aggregating over 9,000 acres, on which they resided, brought suit to enjoin the operation of smelters owned by different corporations as nuisances. The evidence showed that in the smelting of sulphide ores sulphur dioxide and also arsenical fumes were discharged into the air by the smelters, and that those from the different smelters mingled and settling upon the lands of complainants destroyed their trees and crops, poisoned their stock, and endangered the health of themselves and families, rendering their farms in a large measure valueless. *Held*, that equity had jurisdiction on the ground of irreparable injury, and also on the ground of preventing a multiplicity of actions at law against the several defendants, in which it would be difficult or impossible to ascertain the damage committed by either defendant singly, and that on such evidence complainants were entitled to an injunction, regardless of the otherwise lawful character of defendants' business or the amount of their investments.

Appeal from the Circuit Court of the United States for the District of Utah.

Bills by James Godfrey and others against the American Smelting & Refining Company, United States Smelting Company, Utah Consolidated Mining Company, and the Bingham Consolidated Mining & Smelting Company.

Waldemar Van Cott (E. M. Allison, Jr., and William Riter, on the brief), for appellant Utah Consolidated Mining Company.

Andrew Howat and W. H. Dickson (H. R. Macmillan, A. C. Ellis, A. C. Ellis, Jr., and R. G. Schulder, on the brief), for appellant United States Smelting Company.

John A. Street (William H. Bramel, on the brief), for appellant Bingham Consolidated Mining & Smelting Company.

William H. King (Joseph L. Rawlins, on the brief), for appellees.

Before VAN DEVANTER and ADAMS, Circuit Judges, and RINER, District Judge.

RINER, District Judge. This is an appeal from a decree entered by the Circuit Court for the District of Utah, granting an injunction. It is alleged in the bill that the complainants, James Godfrey and four hundred and eight others, who joined with him in the bill, are severally the owners of, and are in possession of, certain farms described in the bill, situated in Salt Lake County, Utah; that they were, at the time the bill was filed and for more than two years prior thereto, occupying their respective farms as homes for themselves and families, and engaged in cultivating their farms; that, but for the injuries complained of, the farms would have been highly productive in fruits, vegetables, cereals, and grasses of great value; that the farms had been brought to a high state of cultivation, and contained many fruit and ornamental trees, also had houses, barns, and other valuable improvements located thereon; that they also kept on their respective farms domestic animals, such as horses,

cattle, and sheep, useful in husbandry. It is further alleged that the defendants each owned a smelter, situated in Salt Lake county, and in proximity to each other and to the complainants' farms; that wrongfully, and in disregard of the rights of the complainants, the defendants, respectively, have maintained and operated, and still maintain and will continue to operate, the smelters as they have been operated, and as they severally threaten to continue to operate the same, which have been, are, and will be injurious to the health and offensive to the senses of the complainants and each of them; that the smelters are and have been employed in the reduction of ores of lead or copper, or both, and known as sulphide ores, and also containing iron sulphates, together with arsenic, antimony, and zinc; that in the process of reduction the sulphur in the ores is reduced and converted into sulphur dioxide, all of which is permitted to and does escape in a gaseous form into the atmosphere, and is borne by the winds, together with the dust and fumes of arsenic and antimony over and upon the farms of complainants; that more than 1,000 tons of sulphur dioxide thus daily escapes from the smelters, and is deposited upon the lands in the neighborhood of the smelters, including the farms of the complainants; that, coming in contact with the moisture in the atmosphere and falling upon the soil or vegetation, the sulphur dioxide becomes sulphurous acid, and to some extent is converted into sulphuric acid, injurious to and destructive of both animal and vegetable life; that the fumes and gases escaping from each of the smelters are commingled in the air and together work their injurious effects upon the farms, property, and health of complainants; that the fumes, gases, and dust permitted to escape and to be deposited upon the farms cause the destruction of fruit and ornamental trees and various kinds of fruits, cereals, and grasses growing on the farms, or so poisons the same as to render them unfit for use; that the sulphur dioxide and other fumes entering the houses of complainants and polluting the atmosphere are offensive to the senses, injurious to the health of the complainants and their families; that the fumes, gases, and dust, either directly or by poisoning the grasses upon which they fall, have caused and are causing many of the domestic animals of the complainants to sicken and die. It is further alleged that complainants have no adequate remedy at law; that each of the defendants threatens to enlarge the capacity of their smelters and increase the amount of these ores to be smelted, thereby augmenting the injuries to complainants; that the injury and damage are oppressive and cumulative, and the grievances are and will be constantly recurring; that relief in actions at law could only be obtained by a multiplicity of suits, and the difficulty and expense attending the same in making proof of damage would render such attempts at relief futile; that the area of land injuriously affected is being constantly increased; that the damage suffered by complainants and others similarly situated in the aggregate exceeds the value of the smelters. The defendants each admit in their answers that they own and are operating the smelters as charged in the bill, denying at some length and in different forms all of

the other allegations of the bill. The complainants replied to the answers, and the case was sent to an examiner to take and report the testimony. Upon the report of the examiner being filed, the case was argued and submitted, and on the 5th of November, 1906, a decree was entered by the Circuit Court, "enjoining each of the defendants from the further roasting or smelting of sulphide ore carrying over 10 per cent. sulphur, and at their present locations, so as to discharge into the atmosphere the sulphur in the form of a gas, and from the further discharging into the atmosphere of arsenic; provided that the defendants or any one or more of them may at any time hereafter apply to the court, upon due notice to the complainants, for a modification or suspension of this injunction upon a showing, which the court may deem sufficient, that conditions have been so changed that the discharge of such sulphurous or arsenical fumes into the air by them, or either of them, may be resumed or otherwise conducted, so as not to create or continue, or contribute to create or continue, the nuisances complained of." From this decree each of the defendants appealed, but the appeal of the American Smelting & Refining Company was dismissed in this court upon a stipulation of the parties, so that the cause is here for review only upon the appeals taken by the three remaining defendants.

The question of the jurisdiction of the Circuit Court in respect to the amount in controversy was raised by two of the appellants at the final hearing, and is again urged here. It will be first disposed of, because, if the Circuit Court was without jurisdiction, it was not within its province to determine the other questions raised, and the cause would have to be reversed, with instructions to dismiss the bill for the want of jurisdiction. In support of their contention, it is insisted by appellants, that "the real matter in controversy is the damage claimed to be suffered by the several appellees, and the value of appellants' right to operate their smelters does not constitute the object of the suit." It is admitted that the smelters, taken either singly or in the aggregate, are worth more than the jurisdictional amount, and it is also admitted that the value of the right or opportunity to continue to run the smelters, or any one of them, is worth more than the jurisdictional amount, but it is said that the real thing that the appellees sue for, and the value of which is not shown, is the privilege of being free from the nuisance of smoke from the smelters. This contention cannot be sustained. The rule, as we understand it, is that when an injunction is asked against the erection and maintenance of a nuisance, it is not important to discuss what kind of damage would result if the nuisance were operated, but rather what the cost of the alleged nuisance will be. Rainey v. Herbert et al., 55 Fed. 443, 5 C. C. A. 183. The general principle is stated by the Supreme Court in the case of Mississippi M. R. Co. v. Ward, 2 Black, 485, 17 L. Ed. 311, as follows: "He seeks redress of a continuing trespass and wrong against him and acts in behalf of himself and of others who are or may be injured. But the want of a sufficient amount of damage having been sustained to give the federal courts jurisdiction will not defeat

the remedy, as the removal of the obstruction is the matter of con-
troversy, and the value of the object must govern."

We have examined the cases called to our attention by counsel
for appellants at the argument, and do not think they conflict
with this rule. The present suit may well be distinguished from
cases upon a money demand, where the matter in dispute is the
debt claimed, and cases sounding in damages where the damages
claimed give jurisdiction, and those where the value of the interest
or estate claimed, as in ejectment suits, determines the jurisdiction,
and suits to quiet the title to parcels of real property, or to remove
a cloud therefrom, by which their use and enjoyment by the owner
are impaired, which are brought within the cognizance of the court
under the statute only by the value of the property affected; and
also cases where, as in Eaton v. Hoge, 141 Fed. 64, 72 C. C. A. 74,
it is said, "in a suit by the several owners of water rights in a
stream, or joining as claimants for convenience only, to enjoin the
obstruction of the stream or the diversion of water therefrom by
defendants, the matter in dispute must exceed two thousand dol-
lars exclusive of interest and costs as to each complainant." It
has also been held repeatedly by the Supreme Court that the dis-
tinct and separate interests of complainants in a suit for relief
against assessments cannot be united for the purpose of making up
the amount necessary to give the court jurisdiction. Wheless v.
St. Louis et al., 180 U. S. 379, 21 Sup. Ct. 402, 45 L. Ed. 583;
Fishback v. Western Union Tel. Co., 161 U. S. 96, 16 Sup. Ct.
506, 40 L. Ed. 630. But none of these cases can apply here, for
the test of jurisdiction is not the amount of damage actually sus-
tained by each of the complainants, but is the value of the object
sought by the bill, which in this case is to compel the defendants
to cease operating their smelters, or to use such appliances in con-
ducting the work as will effectually protect the complainants from
the injuries complained of. Texas Pac. R. R. Co. v. Kuteman,
54 Fed. 547, 4 C. C. A. 503; Whitman v. Hubbell (C. C.) 30 Fed.
81; Louisville & N. R. Co. v. Smith, 128 Fed. 5, 63 C. C. A. 1.

The fact, urged by counsel, that these smelters are located at a
place where by reason of its relation to the railroads and mines is
most convenient for smelting purposes does not, in our judgment,
constitute any defense to a bill to evade a nuisance; neither can
the courts take into consideration the fact that the business is con-
ducted in a proper and reasonable manner, employing the latest
and best devices and instrumentalities, where the evidence shows,
as in this case, that when so operated and conducted, it still results
in very great damage to, if not the total destruction of, complain-
ant's property, and is a menace to health. "The rights of habita-
tion are superior to the rights of trade, and whenever they conflict,
the rights of trade must yield to the primary or natural right." 1
Wood on Nuisances, §§ 514–17 and 23.

It is also insisted that the injury to the appellants and to the
public, if an injunction issues, so greatly exceeds the injury to the
appellees, if denied, that an injunction should not have been granted.
We think it may well be doubted whether this statement is sup-

ported by the record. The parties to this suit, upon both sides, have important and very valuable interests affected by the decree, and it would indeed be difficult to say, upon the facts disclosed by the record, which side would suffer the greater injury. However that may be, we do not think the fact that an actual injury resulting from the violation of a right is small, and the interest to be affected by an injunction is large, should weigh against the interposition of preventive power in equity, when it is clear that on one hand a right is violated and on the other a wrong committed.

It is true in the case of Mountain Copper Co. v. United States, 142 Fed. 625, 73 C. C. A. 621, the court said, "that the comparative convenience or inconvenience to the parties from the granting or withholding the injunction sought should be considered, and that none should be granted whenever it would operate oppressively or inequitably, or contrary to the real justice of the case, is well-established doctrine, and we need hardly multiply authorities to that effect"; but the facts in that case were very different from the facts in the case before us. They are thus stated by the court:

"We have then the ownership in the complainant of a little over four thousand acres of land within the damaged zone, mountainous in character, with little or no soil, practically worthless for agriculture or horticulture, upon which most of the trees and undergrowth as existed had, prior to the commencement of this suit, been killed by the fumes generated by the appellant company (for which it is, of course, liable in damages for whatever they may have been worth), and upon which but little more vegetation of any kind remains, susceptible of destruction. In view of these facts, about which there can be no question upon the record, can it be doubted that the maximum injury that can result to the lands of the complainant embraced by the bill is but a mere trifle in comparison to the loss inflicted by the injunction in question upon the appellant company and those dependent upon and benefited by it."

In that case, according to the statement of facts by the court, the land was practically worthless for any purpose; whereas, in this suit, we have the lands of complainants, exceeding in area nine thousand acres, located in a thickly settled and fertile valley, and all brought to a high state of cultivation; with this condition existing many years prior to the location of the smelters, and now greatly damaged and some of the lands practically ruined by the emission of gas and arsenic from the smelter stacks. The rule that the comparative convenience or inconvenience of the parties from the granting or withholding an injunction when it is sought to abate a nuisance, announced in the case just cited, must, we think, be confined to the particular case then before the court, and is not to be accepted as the statement of a rule to be applied generally in cases where it is sought to abate a nuisance, the existence of which is undoubted. This, we think, clearly appears from an examination of the case and the cases cited in support of it, some of which we will briefly notice.

In Huckenstine's Appeal, 70 Pa. 102, 10 Am. Rep. 669, the rule was announced in substantially the same way, but an examination of the case shows that what the court really decided was that the complainant's evidence as to the fact of the nuisance was rendered more than doubtful by the testimony of the defense. In commenting upon the

rule announced in the Huckenstine Case, in Campbell v. Seamans, 2 Thomp. & C. 231, the Supreme Court of New York said:

"It is in direct conflict with the authorities of this state, and cannot be adopted here as law."

This case was affirmed in 63 N. Y. 568, 20 Am. Rep. 567. And upon this particular question it was overruled by the Supreme Court of Pennsylvania in Sullivan v. Jones & Laughlin Steel Company, 208 Pa. 540, 57 Atl. 1065, 66 L. R. A. 712. In the case last cited, the court, in the course of its opinion, said:

"And as to the principle invoked that a chancellor will refuse to enjoin when greater injury will result from granting than from refusing an injunction, it is enough to observe that it has no application where the act complained of is in itself, as well as in its incidents, tortious. In such a case it cannot be said that injury would result from an injunction, for no man can complain that he is injured by being prevented from doing to the hurt of another that which he has no right to do. Nor can it make the slightest difference that the plaintiff's property is of insignificant value to him as compared with the advantages that would accrue to the defendants from its occupation. There can be no balancing of conveniences when such balancing involves the preservation of an established right."

In that case the defendant had for many years operated his steel furnaces in proximity to the plaintiff's land, and just prior to the commencement of the suit had enlarged his furnaces, and was changing the character of the ore smelted so that it would materially increase the damage inflicted upon the plaintiff.

The case of Powell v. Bentley & Gerwig Fur. Co., 34 W. Va. 804, 12 S. E. 1085, 12 L. R. A. 53, cannot be said to be an authority upon the point, as will be seen from the following quotation taken from the opinion:

"On the question of nuisance, the evidence is conflicting; at any rate, the plaintiff does not put his case high and dry, above all ground of fair questioning. There is enough, perhaps, for the chancellor to have directed an issue. But this issue, the plaintiff by his suit at law has already brought on and made up. Under such a conflict of evidence, the suit at law should have been tried first. The finding on such a question of fact by twelve good and lawful men, who, if deemed proper, may see and hear the thing for themselves, is still greatly relied on by the court. By such course we would avoid the possibility or likelihood of the awkward predicament that now confronts us, of a court of equity having silenced as a nuisance a factory of great cost and general utility, which the jury in the suit at law should afterwards find to be, all things considered, no nuisance at all. Besides, if the jury should find it to be a nuisance by giving substantial damages, the chancellor would then have safer ground for his decree."

In the case of Amelia Milling Co. v. Tenn. Coal, Iron & R. Co. (C. C.) 123 Fed. 811, which was an application for an injunction pendente lite, the court said:

"An injunction pendente lite is very like an execution before judgment, and ought not to be issued except in clear cases of right. In the present case, on the pleadings and affidavits submitted, it is impossible to say with certainty that the operation of the defendant's pumping station and of its water system is a nuisance at all, or, if a nuisance, one of which the milling company, complainant, has any right to complain."

The same doctrine was applied in the case of Sellers v. Parvis (C. C.) 30 Fed. 164. Some other cases are called to our attention in sup-

port of this proposition, but upon examination most of them will be found to be like those just commented upon, either relating to preliminary injunctions, or presenting phases in which there was a question as to whether or not a nuisance was created by the acts of the defendant.

The decision in the case of Madison et al. v. Ducktown Sulphur & Iron Co., 113 Tenn. 331, 83 S. W. 658, much relied upon by appellants, was largely predicated upon a statute of Tennessee, which the court said was to be regarded as declaring the policy of the state upon the subject referred to. If the court based its decision upon grounds independent of the statute, then we think its conclusions are not sustained by the weight of authority. Shelfer v. City of London, etc. (1895), 1 Chan. 287; Imperial Gas Light & Coke Co. v. Broadbent, 7 H. L. C. 600; Atty. Gen. v. Council, etc., Birmingham, 4 Kay & J. 528, 538; Cowper v. Laidler (1903), 2 Chan. 337; Atty. Gen. v. Colney, etc., Asylum, L. R. 4 Chan. App. 146; Corning v. I. & M. Factory, 40 N. Y. 191; Stock v. Judson Township, 114 Mich. 357, 72 N. W. 132, 38 L. R. A. 355; Village of Dwight v. Hayes, 150 Ill. 273, 37 N. E. 218, 41 Am. St. Rep. 367; Harper v. Mountain Water Co., 65 N. J. Eq. 479, 56 Atl. 297; Hennessy v. Carmony, 50 N. J. Eq. 616, 25 Atl. 374; Evans v. Reading Fertilizing Co., 160 Pa. 209, 28 Atl. 702; Weaver v. Eureka Lake Co., 15 Cal. 271; Amsterdam, etc., Co. v. Dean, 13 App. Div. 42, 43 N. Y. Supp. 29; Banks v. Frazier, 111 Ky. 909, 64 S. W. 983; Suffolk, etc., Co. v. San Miguel, etc., Co., 9 Colo. App. 407, 48 Pac. 828; Clowes v. Staffordshire, etc., Co., L. R. S. Ch. App. 125; Pennington v. Brinsop, etc., Co., L. R. 5 Ch. Div. 769; Young v. Banker, etc., Co. (1893), App. Cas. 691; Hobbs v. Amador Co., 66 Cal. 161, 4 Pac. 1147; Chestatee Co. v. Cavendars Co., 118 Ga. 255, 45 S. E. 267; Weston Paper Co. v. Pope, 155 Ind. 394, 57 N. E. 719; Townsend v. Bell, 62 Hun, 306, 17 N. Y. Supp. 210; Brown v. Ontario, etc., Co., 81 App. Div. 273, 80 N. Y. Supp. 837; Beckwith v. Howard, 6 R. I. 1.

Our attention was called at the argument to a statute of Utah, which, it is contended, is a declaration of the policy of the state authorizing the court where an injunction is sought, and where, but for the exercise of the court's discretion, the plaintiff would be entitled to an injunction, to refuse to grant an injunction, and to require the defendant to give a bond to pay the plaintiff all damages that may be recovered on account of a continuance of the nuisance complained of, and it is said that this statute is not merely a rule of procedure, but is a property right which the federal courts must recognize and enforce. We have examined this statute at length, and do not think it susceptible of the construction contended for. We think it cannot apply and was not intended to apply, to final hearings, but can only have reference to interlocutory or restraining orders, and does nothing more than to prescribe for the state courts a method of procedure which has always been obtained in the federal courts. It would be a strained construction of this statute, and one wholly unwarranted by its language, to say that it conferred upon the court the power to perpetuate for all time a nuisance, which would amount to the taking of private property

merely upon the giving of a bond to pay such damages as might be recovered. The Constitution of Utah expressly provides that "Private property shall not be taken or damaged for public use without just compensation." Const. art. 1, § 22. While the Legislature of Utah has declared certain smelter uses to be public, and authorized the exercise of the power of eminent domain for certain purposes, yet the purposes specified do not embrace the acts here complained of, and, as suggested by the Circuit Court, "it must be inferred that with respect to such acts the Legislature did not deem the incidental public benefit of sufficient importance to legalize the acts on condition that compensation be made."

An examination of the record satisfies us that there is no question of laches in this case, and we pass it without further comment.

It is also suggested by some of the appellants that the complainants have only proved possession of their farms, and that an injunction should only issue at the suit of the owner of the freehold. While this proposition of law may well be doubted, it is unnecessary to decide it, for, as suggested by the Circuit Court, "many of the complainants were called as witnesses and testified to both ownership and possession. The direct evidence as to ownership was of a legal conclusion, but evidently for the purpose of convenience, it was not objected to, and cannot be disregarded. The facts do not justify the contention made."

That the damage suffered in this case is substantial, irreparable, and incapable of adequate reparation at law, was found by the Circuit Court, and this view is, we think, fully sustained by the evidence. An injury is irreparable in all cases when the damages which may result therefrom cannot be measured by any certain pecuniary standard. As suggested by the Supreme Court of California, in Daubenspeck v. Grear, 18 Cal. 443:

"The fact that the defendants are willing to pay for the property is immaterial, for there are no means of determining whether the value of the property in money would compensate the plaintiffs for its destruction. It may possess a value to them which no other person would place upon it; and there is neither justice nor equity in refusing to protect them in the enjoyment of it, merely because they may possibly recover what others may deem an equivalent in money. The nature of the property, which consists of fruit trees, ornamental shrubbery, etc., gives them a peculiar claim to this protection."

To remit the complainants to their remedy at law would result in an endless multiplicity of suits. Each defendant would have to be sued separately, as they are not acting in concert, and it would be altogether impossible to determine the proportion of damages occasioned by any one of the smelters, because the fumes from all of them so commingle, "as to make discrimination impracticable." And in such circumstances the court cannot take into consideration the fact that the appellants' business is lawful, and furnishes profitable employment for many people, and is beneficial to the community at large, as well as profitable to the appellants, who have invested large amounts of money in the erection of their works, if the business is carried on in an unlawful manner so as to destroy the property of individual landowners

in the vicinity, or seriously impair or injure the health of those living upon their own land in the vicinity of their works. And when the acts of the defendants produce this result, as is clearly shown by the record in this case, the court is bound to protect such individual rights.

The decree enjoins the defendants from "roasting or smelting sulphide ores carrying over 10 per cent. sulphur, so as to discharge into the atmosphere the sulphur in the form of gas, and from the further discharging into the atmosphere of arsenic." And it is contended by the appellants, and there is some testimony in the case tending to support their contention, that, by the erection of bag houses, the discharge of arsenic into the atmosphere can be fully arrested. If this is true, then, upon the completion of the bag houses, they will not be affected by the decree as to that matter. But it is said in the reply brief, filed by the United States Smelting Company, that the erection of bag houses in a copper smelter, being something new, requires much study and many experiments, and they ask that a reasonable time be granted within which to demonstrate whether or not these bag houses can be successfully operated. The decree in this case was entered on the 5th of November, 1906. Defendants have now had almost a year, and it will be more than a year before a mandate from this court reaches the Circuit Court. If they have been diligent, it seems to us that this time is reasonable and all-sufficient to demonstrate whether the bag houses can or cannot be successfully operated.

It is fully established by evidence in this case that damage is done both by the arsenic and by sulphur dioxide, and it is not claimed by any one that the bag houses will prevent the escape of sulphur dioxide into the atmosphere; appellants concede that the only method by which this gas can be reduced, according to the present condition of science upon the subject, is to diminish the amount of sulphide ores that are being smelted, so that the amount of sulphur dioxide passing into the atmosphere will be thoroughly diffused.

It is suggested by counsel for the United States Smelting Company that by the terms of the decree the smelters may roast or smelt any kind of ore containing not to exceed 10 per cent. sulphur, but cannot mix with silicious ore, carrying no sulphur whatever, any sulphide ores carrying over 10 per cent. and they insist that the decree should be so modified as to permit them to smelt sulphide ores carrying more than 10 per cent. mixed with ores carrying less than 10 per cent. or no sulphur, if the mixture does not contain to exceed the 10 per cent. sulphur authorized by the decree. This request seems to us reasonable and a proper modification of the decree, if it is possible, but the question cannot be disposed of upon this record, as there is no testimony tending to show that it can be done. If by crushing, or other process, the ores can be reduced to particles small enough to secure such a result, we have no doubt that the Circuit Court, upon an application to modify the decree and upon satisfactory evidence that the ores could be so mixed that no more sulphur dioxide would be expelled from smelting the mixture than would be from smelting ores carrying 10 per cent. sulphur in their natural state, would permit this to be done.

After a careful examination of the record, the conclusion reached is that the decree of the Circuit Court should be affirmed, and it is so ordered.

Decree affirmed.

NOTE.—The following is the opinion of Marshall, District Judge, in the Circuit Court:

MARSHALL, District Judge. The object of this bill in equity is to obtain an injunction against a nuisance. The defendants each own a smelter situated in Salt Lake Valley near to Salt Lake City, and in proximity to each other. The ores smelted by them are largely sulphide in character, and in the process employed sulphur is driven off into the atmosphere in the form of sulphur dioxide gas. This gas is heavier than the air, and, when cooled, falls to the ground at a distance from the smelters dependent upon the air currents. When it is brought in contact with moisture either in the form of rain, freshly irrigated ground, or the moisture present in growing plants and the foliage of trees, sulphurous or sulphuric acid is formed, which is destructive to vegetation. Beside the emission of the gas, some flue dust is emitted from the smelters, which contains perceptible quantities of arsenic, resulting in the death of horses and cows. The fumes from the different smelters so mingle with each other as to make it impracticable to distinguish with any certainty the proportion of damage caused separately by each smelter. Beyond the injuries inflicted upon the property of the complainants, great personal discomfort results to those living within the section of country subjected to the fumes. The complainants number 409, and their farms alleged to be injured exceed in area 9,000 acres. The amount of damage that the complainants will suffer by a continuance of the nuisance does not clearly appear, and, indeed, can hardly be estimated in dollars and cents, but it does appear that, in many instances, the injuries inflicted preclude the carrying on of farming operations at a profit, and practically deprive the landowner of any beneficial use of his land. The aggregate damage which will ensue from a denial of an injunction is, necessarily, very large. The defendants have invested large sums in their respective smelters—employ many men; and if these smelters are closed down, the mining interests of the state will be seriously injured. No method has been discovered which will enable the defendants to smelt sulphide ores without permitting the sulphur dioxide gas to escape, unless an expenditure be entailed which would in effect render the reduction of such ores impracticable. In view of this condition, the defense is interposed that the injury to the defendants and to the public, if an injunction issues, so greatly exceeds the injury to the plaintiffs, if it be denied, that an injunction should not be ordered. In the case of McCleery et al. v. Highland Boy Gold Mining Company (C. C.) 140 Fed. 951, I expressed my views on this defense, as applied to a similar state of facts, and I will not repeat what was there said; but the importance of the controversy, the arguments of counsel, and the recent decision of the Circuit Court of Appeals of the Ninth Circuit in Mountain Copper Co. v. United States, 142 Fed. 625, 73 C. C. A. 621, demanded a reinvestigation of the question. This reinvestigation has been made, and has confirmed me in my original opinion. In Mountain Copper Co. v. United States, supra, the court denied an injunction on the ground that the injury which would be caused to the defendant by an injunction would be very great, and that suffered by the complainant small, if the injunction was denied. In the opinion it was said: "That the comparative convenience or inconvenience to the parties from the granting or withholding the injunction sought should be considered, and that none should be granted whenever it would operate oppressively or inequitably or contrary to the real justice of the case, is the well-established doctrine, and we need hardly multiply authorities to that effect." The case calling for this declaration of law is thus stated in the opinion: "We have then the ownership in the complainant of a little over four thousand acres of land within the damaged zone, mountainous in character, with little or no soil, practically worthless for agriculture or horticulture, upon which most of such trees and undergrowth as existed, had, prior to the commencement of this suit, been killed by the

fumes generated by the appellant company (for which it is of course liable in damages for whatever they may have been worth), and upon which but little more vegetation of any kind remains susceptible of destruction. In view of these facts, about which there can be no question upon the record, can it be doubted that the maximum injury that can result to the lands of the complainant embraced by the bill, is but a mere trifle in comparison to the loss inflicted by the injunction in question upon the appellant company, and those dependent upon and benefited by it?" It will be readily perceived that the case was an extreme one against the complainant. The declaration of law above quoted must be tested by the authorities cited in its support, and these will be examined.

In Huckenstine's Appeal, 70 Pa. 102, 10 Am. Rep. 669, the law was laid down in much the same way, but it was unnecessary to the decision, because the court held that the complainant's evidence as to the fact of the nuisance "is rendered more than doubtful by the testimony of the defense"—a sufficient reason for denying an injunction. In Campbell v. Seamans, 2 Thomp. & C. 231, the Supreme Court of New York said of this case: "It is in direct conflict with the authorities of this state (New York) and cannot be adopted here as law." On the point to which it is cited, it has been overruled in Pennsylvania. Sullivan v. Jones & Laughlin Steel Co., 208 Pa. 540, 57 Atl. 1065, 66 L. R. A. 712. In this case the defendant had, for many years, operated steel furnaces in proximity to the plaintiff's land, but had recently before the commencement of the suit enlarged the furnaces, and so changed the character of the ore smelted as to materially increase the damage inflicted upon the plaintiff. At page 1069 of the opinion, as reported in the Atlantic Reporter, the court says: "When, however, as the result of improvements voluntarily made by the appellee, and its use of a new ore, the annoyance, inconvenience, and injury to which the appellants are now subjected do not differ merely in degree from those to which they formerly submitted as part of their lot as citizens of the 'Iron City,' but in kind, and practical destruction and confiscation of their properties confront them, a very different situation is presented to a chancellor from those cases in which the rule is laid down that people who live in such a city or within its sphere of usefulness do so of choice, and therefore voluntarily submit themselves to its peculiarities and its discomforts. That very rule as announced in Huckenstine's Appeal, supra, recognizes their right to live and have their homes there; and a case cannot be found as authority for the right of any manufacturing company, located in a manufacturing district of a city, to so rebuild and operate its furnaces as to actually destroy homes and other property in a residential portion of the same city. That this is what the appellee is doing with the properties of the appellants is an irresistible conclusion, and the only relief is by injunction. If it is to be permitted to so operate its furnaces that the burning and corroding ore dust emitted from their stacks is borne by the winds and scattered over the properties of the appellants with destroying effect, simply because of the plea that it cannot be helped, for the same reason it might ask a chancellor to stay his arm from arresting the descent of showers of fire from the same stacks down on the same nearby homes. If the appellees possessed the right of eminent domain, it might take the properties of the appellants and do with them what it pleases, but, not having such high right, it cannot do so, even indirectly. It has a right to the use and enjoyment of its own property, but so have the appellants to theirs, for whom the law says to the former, 'sic utere tuo ut alienum non lædas;'" and on pages 1070 and 1071, it is further stated: "It is urged that as an injunction is a matter of grace, and not of right, and more injury will result in awarding than refusing it, it ought not to go out in this case. A chancellor does act as of grace, but that grace sometimes becomes a matter of right to the suitor in his court, and, when it is clear that the law cannot give protection and relief—to which the complainant in equity is admittedly entitled—the chancellor can no more withhold his grace than the law can deny protection and relief, if able to give them. This is too often overlooked, when it is said that in equity a decree is of grace, and not of right, as a judgment at law. In Walters v. McElroy et al., 151 Pa. 549, 25 Atl. 125, the defendants gave as one of the reasons why the plaintiff's bill should be dismissed that his land was worth

but little, while they were engaged in a great mining industry which would be paralyzed if they should be enjoined from a continuance of the acts complained of; and the principle was invoked that, as a decree in equity is of grace, a chancellor will never enjoin an act, where, by so doing, greater injury will result than from a refusal to enjoin. To this we said: 'The phrase "of grace," predicated of a decree in equity, had its origin in an age when kings dispensed their royal favors by the hands of their chancellors; but although it continues to be repeated occasionally, it has no rightful place in the jurisprudence of a free commonwealth, and ought to be relegated to the age in which it was appropriate. It has been somewhere said that equity has its laws as law has its equity. This is but another form of saying that equitable remedies are administered in accordance with rules as certain as human wisdom can devise, leaving their application only in doubtful cases to the discretion, not the unmerited favor or grace, of the chancellor. Certainly no chancellor in any English speaking country will at this day admit that he dispenses favors or refuses rightful demands, or deny that, when a suitor has brought his cause clearly within the rules of equity jurisprudence, the relief he asks is demandable ex debito justitiæ, and needs not to be implored ex gratia. And as to the principle invoked, that a chancellor will refuse to enjoin when greater injury will result from granting than from refusing an injunction, it is enough to observe that it has no application where the act complained of is in itself, as well as in its incidents, tortious. In such case it cannot be said that injury would result from an injunction, for no man can complain that he is injured by being prevented from doing to the hurt of another that which he has no right to do. Nor can it make the slightest difference that the plaintiff's property is of insignificant value to him as compared with the advantages that would accrue to the defendants from its occupation.' There can be no balancing of conveniences when such balancing involves the preservation of an established right, though possessed by a peasant only to a cottage as his home, and which will be extinguished if relief is not granted against one who would destroy it in artificially using his own land. Though it is said a chancellor will consider whether he would not do a greater injury by enjoining than would result from refusing and leaving the party to his redress at the hands of a court and jury, and if, in conscience, the former should appear, he will refuse to enjoin (Richard's Appeal, 57 Pa. 105, 98 Am. Dec. 202); that 'it often becomes a grave question whether so great an injury would not be done to the community by enjoining the business that the complainant party should be left to his remedy at law' (Dilworth's Appeal, 91 Pa. 247); and similar expressions are to be found in other cases; 'none of them, nor all of them, can be authority for the proposition that equity, a case for its cognizance being otherwise made out, will refuse to protect a man in the possession and enjoyment of his property because that right is less valuable to him than the power to destroy it may be to his neighbor or to the public.' Evans v. Reading Chemical Fertilizing Co., 160 Pa. 209, 28 Atl. 702. The right of a man to use and enjoy his property is as supreme as his neighbor's, and no artificial use of it by either can be permitted to destroy that of the other."

The lack of appositeness in Powell v. Bentley & Gerwig Furniture Co., 34 W. Va. 804, 12 S. E. 1085, 1088, 12 L. R. A. 53, 56, is best shown by a quotation from the opinion where it is said: "On the question of nuisance, the evidence is conflicting; at any rate the plaintiff does not put his case high and dry, above all ground of fair questioning. There is enough, perhaps, for the chancellor to have directed an issue. But this issue, the plaintiff by his suit at law has already brought on and made up. Under such a conflict of evidence, the suit at law should have been tried first. The finding on such a question of fact of twelve good and lawful men, who, if deemed proper, may see and hear the thing for themselves, is still greatly relied on by the court. By such course we would avoid the possibility or likelihood of the awkward predicament that now confronts us, of a court of equity having silenced as a nuisance a factory of great cost and of general utility, which the jury in the suit at law should afterwards find to be, all things considered, no nuisance at all. Besides, if the jury should find it to be a nuisance by giving substantial damages, the chancellor would then have safer ground for his decree. The

decrees of the 12th and 14th August, 1890, must, therefore, be reversed, and the cause remanded, the further hearing to abide the. determination of the issue of nuisance or no nuisance in the suit at law, or to be demurred to by plaintiff, according as he may be advised." It is familiar law that in cases of doubt, and before the determination of complainant's right at law, no injunction will issue. Amelia Milling Co. v. Tenn. Coal, Iron & R. Co. (C. C.) 123 Fed. 811, was an application for an injunction pendente lite; and at page 813 of the opinion, the court said: "An injunction pendente lite is very like an execution before judgment, and ought not to be issued except in clear cases of right. In the present case, on the pleadings and affidavits submitted, it is impossible to say with certainty that the operation of the defendant's pumping station and of its water system is a nuisance at all, or, if a nuisance, one of which the milling company, complainant, has any right to complain." The same thing is true of Sellers v. Parvis (C. C.) 30 Fed. 164, and the reason for the conclusion of the court is found in a quotation from the opinion, at pages 166, 167, where it is said: "A preliminary injunction, if now issued, would be simply staying the alleged nuisance during the pendency of further proceedings to establish the rights of the parties, and it would be imposing too great a hardship upon the defendant to stop its business at this time when the complainant could derive no benefit or advantage which would compensate for the certain injury which would be inflicted upon the company, if after a fuller investigation it should appear that it is not in fault, or that the complainant had an adequate legal remedy." Undoubtedly these decisions on applications for a preliminary injunction were correct. In Evans v. Reading, etc., Co., 160 Pa. 209, 28 Atl. 702, it was said: "So far as the 'balance of injury' notion refers to the parties to the litigation, * * * its legitimate application is to motions for preliminary injunction; not to final decrees. Where the question before the court is as to the propriety of stopping a business by preliminary injunction upon an ex parte showing, which may or may not be substantiated by further examination of the case in due course, it is very well for the chancellor to take into account the magnitude, of the defendant's investment, and compare it with the character of the complainant's alleged injury, and, if the latter appears trifling beside that which would result from the impairment of the former, he may well refuse, to exercise his power until more fully advised."

The application of such cases to a final hearing is not apparent. Peterson v. City of Santa Rosa, 119 Cal. 387, 51 Pac. 557, does not support the doctrine for which it is cited. In that case a perpetual injunction against a discharge of sewage by a municipal corporation was ordered. In Demarest v. Hardham, 34 N. J. Eq. 469, what was said about the "balance of injury" doctrine was largely dictum. In that case, machinery operated by the defendant communicated so much vibration to the wall of the plaintiff's house as to constitute a nuisance. The court concluded that, if the position of the machinery were changed, all substantial vibration would cease, and it was ordered that the defendant make the requisite change, and that if he failed to do so an injunction issue. So far as this case announces the doctrine of the "balance of injury," it has been overruled in New Jersey. Hennessy v. Carmony, 50 N. J. Eq. 616, 25 Atl. 378. In Tuttle v. Church (C. C.) 53 Fed. 422, the defendant's manufacturing industry, alleged to create a nuisance, had been carried on for 30 years. The plaintiff had lived on his premises subjected to the claimed nuisance, and without complaint for 12 years. The suit was instigated by a third person to gratify a private spite. The court found the evidence as to the fact of a nuisance doubtful, and that if the nuisance existed it was occasional and evanescent. The injunction was properly denied. The last case cited is Madison et al. v. Ducktown Sulphur Copper & Iron Co. et al., 113 Tenn. 331, 83 S. W. 658. In that case, as in this, the plaintiffs, who were farmers, sought to enjoin the operations of several copper smelters. The lands of the plaintiffs aggregated 627 acres, 452 acres of which was assessed for taxation at the aggregate sum of $689; the assessed value of the remaining 175 acres did not appear, but the court found that its value was about the same per acre as that of the other land, and that the entire acreage consisted of thin mountain land of little value for agriculture. The property of one of the defendants was assessed for taxation at $1,279,533,

with an average pay roll of $40.000 per month, 1,300 men employed, and 12,000 persons dependent on the industry for support. The case was an extreme one. In Tennessee there is a special statute, the effect of which on the decision is apparent from this quotation from the opinion at page 666 of 83 S. W.: "It cannot be doubted, therefore, that although the amending acts above copied purport, in terms, to apply only to suits brought for the recovery of damages resulting from nuisances the purpose was to declare the legislative will in respect of the use of the injunctive power in nuisance cases when sought to be used in effecting final relief, and to ordain that, in administering this relief, the court should exercise a sound discretion, and either 'order or decline to order the nuisance to be abated,' as such sound discretion should dictate. This act must be regarded as declaring the policy of the state upon the subject referred to. It is perceived from the caption that the Legislature had in view the public utility of enterprises attacked on the ground of nuisance, and authorized the court to grant or withhold the injunction, as wise discretion might suggest or warn." These decisions, however appropriate to the facts involved in Mountain Copper Co. v. United States, do not seem to justify the application of the doctrine there advanced to the case at bar. The Constitution of Utah provides that: "Private property shall not be taken or damaged for public use without just compensation." The Legislature of Utah has declared certain smelter uses to be public, and authorized the exercise of the power of eminent domain for these specified purposes. Those uses, however, do not embrace the acts here complained of, and therefore it must be inferred that with respect to such acts, the Legislature did not deem the incidental public benefit of sufficient importance to legalize the acts on condition that compensation be made. Where the Legislature has refused to act, it is not for a court to interfere by judicial legislation.

In Shafer v. City of London Electric Light Co. (1895) 1 Chan. 287, 315, the court, in considering Lord Cairns' Act (21 and 22 Victoria, c. 27), which conferred upon the court of chancery jurisdiction to award damages in lieu of an injunction, said: "Jurisdiction to give damages instead of an injunction is, in words, given in all cases; but the use of the word 'damages' has led to a doubt whether the act applies to cases where no injury at all has yet been inflicted, but where injury is threatened only. Subject, however, to this doubt, there appears to be no limit to the jurisdiction; but, in exercising the jurisdiction thus given, attention ought to be paid to well-settled principles; and ever since Lord Cairns' Act was passed the court of chancery has repudiated the notion that the Legislature intended to turn that court into a tribunal for legalizing wrongful acts; or, in other words, the court has always protested against the notion that it ought to allow a wrong to continue simply because the wrongdoer is able and willing to pay for the injury he may inflict. Neither has the circumstance that the wrongdoer is, in some sense, a public benefactor (e. g., a gas or water company or a sewer authority) ever been considered a sufficient reason for refusing to protect by injunction an individual whose rights are being persistently infringed. Expropriation even for a money consideration is only justifiable when Parliament has sanctioned it. Courts of justice are not like Parliament, which considers whether proposed works will be so beneficial to the public as to justify exceptional legislation and the deprivation of people of their rights with or without compensation." The English cases are distinctly against the defense here sought to be interposed. Shelfer v. City of London, etc. (1895), 1 Chan. 287; Imperial Gas Light & Coke Co. v. Broadbent, 7 H. L. C. 600; Atty. Gen. v. Council, etc., Birmingham, 4 Kay & J. 528, 38; Cowper v. Laidler (1903), 2 Chan. 337; Atty. Gen. v. Colney, etc., Asylum, L. R. 4 Chan. App. 146. The weight of authority in the United States is also opposed to it. Corning V. I. & M. Factory, 40 N. Y. 191; Stock v. Judson Township, 114 Mich. 357, 72 N. W. 132, 38 L. R. A. 355; Village of Dwight v. Hayes, 150 Ill. 273, 37 N. E. 218, 41 Am. St. Rep. 367; Harper v. Mountain Water Co., 65 N. J. Eq. 479, 56 Atl. 297; Hennessy v. Carmony, 50 N. J. Eq. 616, 25 Atl. 374. The cases contra have been extreme cases, in most of which it might be said either that the evidence of the nuisance left the matter in doubt, or that the injury apprehended was of a very slight character, compensation for which in an action at law was adequate. In such cases, of course, no injunction should

issue. Osborne v. Mo. Pac. Ry., 147 U. S. 248, 259, 13 Sup. Ct. 299, 37 L. Ed. 155; McElroy v. Kansas City (C. C.) 21 Fed. 257. In the case at bar, the injury is substantial, irreparable; for the destruction of fruit and ornamental trees has always been so held (United States v. Guglard [C. C.] 79 Fed. 21, 23), and incapable of adequate reparation at law. The suggestion that the complainants should be remitted to actions at law for damages is entitled to but little weight. In such actions the damages recovered would be limited to that suffered before the date of the writ. The result would be an endless multiplicity of suits, in each of which only one of the defendants could be sued, for they are not acting in concert; and it would be a matter of great difficulty to determine the proportion of damage caused by the one defendant, because the fumes from the smelters so commingle as to make discrimination impracticable. The remedy would be worse than the evil. To the extent that the complainants are denied an adequate remedy because of the indirect public benefit, their property is injured without compensation—a result which should be less possible under the system of written Constitutions in the United States than in England.

It is next argued that, because of laches, damages should be assessed in lieu of an injunction. This was done in the case of McCleery v. Highland Boy Gold Mining Company under the exceptional circumstances there presented; and, as to some of the complainants here, a similar decree might meet the demands of justice, but as to many of the complainants there has been no undue delay. The injury resulting from the smelter fumes has been cumulative on the one hand, and has, on the other, extended, as time has elapsed, over a wider area. Farmers who had not been injured were not required to anticipate this; and, as to such complainants, their right to an injunction has not been waived.

It is also said that the complainants have only proved possession of their respective farms, and that an injunction should only issue at the suit of the owner of the freehold. I should be inclined to doubt the proposition of law announced, but it is not necessary to decide it. Many of the complainants were called as witnesses, and testified to both ownership and possession. The direct evidence as to ownership was of a legal conclusion, but evidently for the purposes of convenience, it was not objected to, and cannot be disregarded. The facts do not justify the contention made. The American Smelting & Refining Company further claims a prescriptive right. That company succeeded to the ownership of three smelters situated within a radius of several miles from its present plant, at which the smelting of sulphide ores had been carried on for many years; the aggregate quantity of such ores smelted not being greatly less than the amount now smelted at its present smelter. The evidence justifies the conclusion that for some reason, either the lack of concentration of the smelting or a difference in the methods employed, but little damage was done by these separate smelters. In any event a prescriptive right to continue these smelters can in no event justify the damage done by the new smelter, situated at a different place, and conducting operations on a much larger scale than any one of the former smelters. It is also contended that if the American Smelting & Refining Company operated alone, no substantial damage would be done. The evidence does not satisfy me that this is true, but, if true, it is irrelevant. It is sufficient to warrant an injunction that it materially contributes to substantial damage. It might be true in a given case that no one smelter, operating alone, would do substantial damage, but that such damage would result from the united operations of all. If in such a case any distinction be made it should be in favor of the smelter first beginning its operations; and in this case, that would not be the American Smelting & Refining Company. To a certain extent I am inclined to yield to the argument that the last-named company does little damage. The evidence does not clearly show that damage would result from the smelting of ores carrying small per cents. of sulphur. The American **Smelting & Refining Company** smelts some ores classed by it as direct smelting ores, without any preliminary roasting, and yet carrying a sulphur content not exceeding 10 per cent. Until the complainants have established at law that the smelting of these ores constitutes a nuisance, I am unwilling to prohibit it.

The jurisdiction of the court is also challenged, on the ground that it is not alleged that any one complainant will suffer a damage exceeding $2,000 if an injunction be denied. The discussion of this question, properly preliminary, has for convenience, been deferred to the close of this opinion. As this suit is for an injunction to restrain the operation of the smelters, the value of the matter in dispute is the value of the claimed right of which the defendants will be deprived by the granting of the relief sought. Miss. & Mo. R. R. Co. v. Ward, 2 Black, 485, Fed. Cas. No. 17,156; Whitman v. Hubbell, 30 Fed. 81; Texas Pac. R. R. Co. v. Kuteman, 54 Fed. 547, 4 C. C. A. 503; Rainey v. Herbert, 55 Fed. 443, 5 C. C. A. 183; Amelia Mill Co. v. Tenn. Coal, Iron & R. Co. (C. C.) 123 Fed. 811; Louisville, etc., R. Co. v. Smith, 128 Fed. 5, 63 C. C. A. 1; McKee v. Chautauqua Association (C. C.) 124 Fed. 811. All of the defendants, except the Bingham Consolidated Mining & Smelting Company and the Bingham Copper & Gold Mining Company, affirmatively allege this value in a sum largely exceeding the minimum limit of jurisdiction, and all of the defendants have based their chief defense on evidence of this value. The difficulty is that, with respect to the two defendants above named, nowhere in the bill or answer is there any specific averment as to the value of the matter in dispute; and as to those defendants no decree on the merits can be entered in this state of the pleadings. However, as the evidence of the defendants clearly shows the requisite value, the complainants will be permitted to file an amendment to their bill in this respect to conform to the proof. Sufficient authority for this will be found in Tremaine v. Hitchcock, 23 Wall. 518, 23 L. Ed. 97. Upon the filing of the amendment authorized, a decree will be entered, enjoining each of the defendants from the further roasting or smelting of sulphide ores carrying over 10 per cent. sulphur, and at their present locations so as to discharge into the atmosphere the sulphur in the form of a gas, and from further discharging into the atmosphere of arsenic; provided that the defendants, or any one or more of them, may at any time hereafter apply to the court, upon due notice to the complainants, for a modification or suspension of this injunction, upon a showing which the court may deem sufficient that conditions have, been so changed that the discharge of such sulphurous and arsenical fumes into the air by them or either of them may be resumed, or otherwise conducted, so as not to create or continue, or contribute to create or continue, the nuisance complained of. As the interests involved are large, and the questions decided of great importance, this injunction will only take effect at the expiration of 30 days from the date of the decree, a period sufficient for the perfecting of an appeal.